*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0050P (6th Cir.)
File Name: 03a0050p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

GARY G. SHARPE; WILLIAM
G. POTTER; KENNETH F.
SCARBROUGH; FRANK E.
POTTER; WILLIAM H.
MCGINNIS,
     *Plaintiffs-Appellants/*
     *Cross-Appellees*
     *(00-5805/6089),*
     *Plaintiffs-Appellees/*
     *Cross-Appellants*
     *(00-6361/6362),*

       *v.*

BRUCE CURETON, Chief, in
his individual and official
capacities; VICTOR ASHE,
Mayor, in his individual and
official capacities; CITY OF
KNOXVILLE,
     *Defendants-Appellees/*
     *Cross-Appellants*
     *(00-5805/6089),*
     *Defendants-Appellants/*
     *Cross-Appellees*
     *(00-6361/6362),*

Nos. 00-5805/
6089/6361/6362

1

ROBERT PRESSLEY, Deputy
Fire Chief, in his individual
and official capacities,
                    *Defendant-Appellee*
                         *(00-5805),*
                    *Defendant (00-6089),*
                *Defendant/Cross-Appellee*
                    *(00-6361/6362).*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 96-00916—Robert P. Murrian, Magistrate Judge.

Argued:  June 19, 2002

Decided and Filed:  February 13, 2003

Before:  NORRIS and BATCHELDER, Circuit Judges;
         FORESTER, Chief District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  Wanda G. Sobieski, SOBIESKI, MESSER &
ASSOCIATES, Knoxville, Tennessee, for Plaintiffs.  Robert
H. Watson, Jr., WATSON, HOLLOW & REEVES,
Knoxville, Tennessee, for Defendants.  **ON BRIEF:**  Wanda
G. Sobieski, Diane Marie Messer, SOBIESKI, MESSER &
ASSOCIATES, Knoxville, Tennessee, for Plaintiffs.  Robert
H. Watson, Jr., John C. Duffy, WATSON, HOLLOW &
REEVES, Knoxville, Tennessee, Michael S. Kelley, CITY

_____

[*] The Honorable Karl S. Forester, Chief United States District Judge
for the Eastern District of Kentucky, sitting by designation.

determination of the plaintiffs' fees reasonably incurred before the offer of judgment on December 6, 1996.[17]

## IV.  CONCLUSION

For the above reasons, we affirm the district court's finding that the continuing violation doctrine does not apply; affirm the denial of the FLSA claim; vacate the injunction; reverse the Rule 68 decision; vacate the entry of attorney fees; and direct the district court on remand to issue a finding regarding attorney fees reasonably incurred by the plaintiffs' attorneys before December 6, 1996.

---

[17]The plaintiffs do not dispute that Rule 68 is operable in that the final judgments are less than the amount of the offers.

OF  KNOXVILLE  LAW  DEPARTMENT,  Knoxville, Tennessee, for Defendants.

_____

### OPINION

_____

FORESTER, Chief District Judge.  Immediately after being re-elected as Mayor of Knoxville, Tennessee, in September, 1995, Victor Ashe ordered Bruce Cureton, Fire Chief of the City of Knoxville, to transfer five Knoxville Fire Department firefighters to undesirable locations, ostensibly in retaliation for the firefighters' support of Ashe's opponent in the election.  When these firefighters, Gary Sharpe ("Sharpe"), William Potter ("W. Potter"), Kenneth Scarbrough ("Scarbrough"), Frank Potter ("F. Potter"), and William McGinnis ("McGinnis"), were denied merit and bonus pay for 1995 and 1996, they filed this action pursuant to 42 U.S.C. § 1983.  Plaintiff W. Potter added a claim alleging that he was transferred by the City of Knoxville in an effort to circumvent overtime pay requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et. seq.*

The jury awarded the plaintiffs a total of $30,645 in damages, but this amount was reduced when the district court ruled as a matter of law that recovery for the plaintiffs' retaliatory transfers was barred by the statute of limitations because the continuing violation doctrine did not apply.  The district court also made the following rulings: it held that Offers of Judgment made by the defendants pursuant to Fed. R. Civ. P. 68 were unenforceable because they were void for vagueness; it enjoined Ashe from retaliating not only against the plaintiffs, but against other Knoxville Fire Department employees; it denied W. Potter's FLSA claim; and it granted the plaintiffs only a portion of the attorney fees they requested.  The plaintiffs appeal the district court's Judgment as a Matter of Law against their transfer claims, the reduction of their attorney fees, and the dismissal of the FLSA claim,

and they request this Court to take notice of post-judgment facts. The defendants cross-appeal the grant of the injunction and the holding that the Rule 68 offers were invalid.

## I. FACTUAL AND PROCEDURAL BACKGROUND

W. Potter became a member of the Knoxville Fire Department ("KFD") in 1956, and by September of 1995 had advanced to the position of Administrative Deputy Chief of Firefighting.

Scarbrough joined the KFD in 1967, and by September, 1995, served as a fire officer at a north Knoxville station located conveniently near his home.

F. Potter (a younger brother of W. Potter) joined the KFD in 1972, and by September, 1995, served as assistant chief for a district in east Knoxville.

McGinnis joined the KFD in 1960, and by September 1995 served as an assistant chief for a district in west Knoxville.

In a 1995 Knoxville mayoral race between incumbent Mayor Victor Ashe and challenger Ivan Harmon, W. Potter and the other plaintiffs openly supported Harmon, with the exception of plaintiff McGinnis who remained politically neutral. Ashe ultimately won the September 26, 1995, election, and shortly thereafter transferred all of the plaintiffs from their positions except for Sharpe.

On September 26, W. Potter received a letter delivered by Chief Cureton, informing him that he was being transferred from the administrative offices to the main fire hall, where he would no longer have access to a city car, and his new job would encompass evaluating fire and emergency service responses, tasks for which he was unfamiliar and did not feel qualified to undertake. W. Potter was assigned an office at the new location that was formerly used primarily as a storage closet and remained in disrepair. W. Potter worked at this location until February 1996, when he was transferred to

additional terms, and not a request for clarification.[16] Regardless, the letter tellingly refers to the step increases in similar fashion to the defendants' offer, without mentioning specific dollar amounts or requesting monetary clarification, further revealing the plaintiffs' familiarity with the meaning of such an increase. The district court's conclusion that "[t]he defendants could have refined their offers of proof in response to plaintiffs' inquiries but they did not do so" incorrectly implies that Rule 68 requires the offer to be normatively acceptable to the plaintiff, instead of merely sufficiently clear as to allow the plaintiffs to understand the terms. The letter did not ask for *clarification* of the monetary part of the offers; it merely sought *refinement* of the injunctive part.

As for W. Potter's offer, step increases were not at issue because he was serving at the highest possible step of his rank. The plaintiffs' argument that it was indefinite because it did not specify the rate of pay for the first 40 hours of the week is not well taken. All uniformed members of the Knoxville Fire Department, including W. Potter, are salaried employees compensated on the basis of an annual base salary paid in bi-weekly installments. The offer further specified the overtime compensation rate in compliance with the Fair Labor Standards Act.

In sum, the defendants' Rule 68 offers are not void for vagueness; the offers were sufficiently definite to create the power of acceptance in the firefighters, triggering the mandatory application of Rule 68. Both the district court, as well as this Court, are without equitable discretion to alter the effect of Rule 68. Accordingly, the district court's award of attorneys' fees is vacated and the matter is remanded for a

---

[16]For example, the plaintiffs' letter attempts to alter the language of the defendants' unambiguous offer to not discriminate in the future. Dickering or subjective dissatisfaction with the terms of an offer does not render the offer ambiguous, and cannot alleviate the mandatory operation of Rule 68.

The firefighters' pleas of ambiguity are a thinly-veiled attempt to avoid the mandatory application of Rule 68 in this case, due to the admittedly severe effect the rule has on plaintiffs' attorney fee award. It is undisputed that under the Knoxville merit pay system that a one-step pay increase results in an increase in the recipient's pay by 2.5%, beginning the day the pay increase becomes effective. The defendants' offer providing for a two-step increase would correspondingly result in a 5% pay increase. The veteran firefighters, having the benefit of years of experience with the Knoxville merit pay system and having received previous step increases throughout their careers, were fully familiar with the pay step system, as reflected in their trial testimony. *See Said v. Virginia Commonwealth University*, 130 F.R.D. 60, 63 (E.D. Va. 1990) (approving use of terms of art commonly known to the parties in the offer of judgment). These offers did not lump together a sum for the plaintiffs to allocate among themselves; instead, separate offers were made to each firefighter, and the offers did not lump together the damages portion with the award of costs. *Cf. Marek*, 473 U.S. at 5-6. Thus, the relative comparisons of the increase among each firefighter is of no moment, as each firefighter could determine his own increase if he accepted the offer.

Likewise, the offer of a promotion is free from ambiguity, and the plaintiffs were well aware that the salary increase would be reflected on their bi-weekly pay check during the duration of their careers, and in their pensions, which reflected 50% of their salary. The 5% pay increase specified to be effective eleven months earlier than the offer obviously includes "back pay." In addition, the offers made clear that the pay increase was effective on the exact date it became effective for all other firefighters who received the merit pay at issue, January 7, 1996.

The letter from plaintiffs' attorney to defense counsel is more accurately construed as a bargaining tool seeking

become a shift chief, a position at which his hours per week were increased from 40 to 56.

Scarbrough was also informed of his transfer on September 26 when he was told that he should report the next morning to an unfamiliar station in south Knoxville. Scarbrough testified that the transfer damaged his performance because it is important for firefighters to be familiar with the territory they protect.

F. Potter learned on September 25 that he would be transferred to a station in north Knoxville effective September 26. F. Potter and Ashe had been friends, but the evidence indicated that F. Potter had deceived Ashe by voicing his political support, but appearing at a Harmon fundraiser. F. Potter spent four months at the north Knoxville location before being transferred to west Knoxville. He testified that the transfers to unfamiliar locations had an immediate impact on his performance.

McGinnis similarly learned of his transfer on September 25 and testified that being in the unfamiliar territory was humiliating and damaged his performance.

On October 2, 1995, all four officers filed grievances with the Knoxville Civil Service Merit Board alleging that their transfers were in retaliation for the exercise of First Amendment rights. A stay was ultimately entered and the grievances were not resolved.[1]

In August 1996, Ashe moved F. Potter, Scarbrough, and McGinnis back to their original locations, and McGinnis retired in 1997. In October, 1997, F. Potter was moved back to a forty hour per week position that he continues to hold. This position includes an office comparable to his former

[1]The evidence remains disputed as to which party brought about the stay of the grievance proceedings.

office, and allows access to a city vehicle, but involves working a swing shift.

In early 1996, the KFD announced its merit pay awards for 1995. Cureton controlled the merit pay decisions, and neither the plaintiffs nor any other KFD member who supported Harmon received merit pay. The firefighters were again denied merit pay for 1996 and appealed this denial; but Cureton sent them letters stating that the KFD could not respond because merit pay was an issue in litigation. McGinnis testified that at Cureton's deposition, Cureton indicated that none of the firefighters were even considered for merit pay in 1996. The KFD abandoned its merit pay policy after 1996.

On October 24, 1996, the firefighters filed this action in federal district court pursuant to 42 U.S.C. § 1983, alleging that defendants Bruce Cureton, Victor Ashe, Robert Pressley, and the City of Knoxville conspired, through discrimination and retaliation, to violate the firefighters' First Amendment rights of political belief and association. The plaintiffs sought front and back pay, compensatory, nominal, and punitive damages, as well as an injunction, attorney fees, and taxation of costs. In addition, W. Potter sought damages under the FLSA and reinstatement to his prior KFD position; Sharpe also sought a promotion.

On January 7, 1997, the plaintiffs amended their complaint to allege two additional retaliatory acts that occurred since the initial complaint, namely, that Cureton had denied their requests for merit and bonus pay increases for 1996, and Ashe refused to consider a reasonable request to modify their pension plans. The individual defendants moved for summary judgment on qualified immunity grounds; however, the district court denied the motion and this Court affirmed the lower court's decision on interlocutory appeal. *See Sharpe v. Cureton*, 1999 U.S. App. LEXIS 531 (6th Cir. Jan. 13, 1999). The defendants' petition for writ of *certiorari* was denied. *See Cureton v. Sharpe*, 528 U.S. 812 (1999).

The plaintiffs attempt to escape the mandatory operation of Rule 68 by arguing that the defendants' offers were void for vagueness and thus incapable of being accepted. Contract principles apply to Rule 68 offers, and a plaintiff contesting the validity of a Rule 68 offer may assert contractual defenses. *Mallory*, 922 F.2d at 1279. Apparently, due to a dearth of Sixth Circuit law addressing the specificity required for Rule 68 offers, the district court borrowed the basic standard from *Gavoni v. Dobbs House, Inc.*, 164 F.3d 1071, 1075-76 (7th Cir. 1999), which held that "[t]he defendant must show that the offer was more favorable than the judgment and that the mandatory cost-shifting provision was therefore triggered." (citations omitted). Specifically, "[t]here must . . . be a clear baseline from which plaintiffs may evaluate the merits of their case relative to the value of the offer." *Id.* at 1076. (citations omitted).

W. Potter's offer was customized for him; the other four offers provided for two-step merit pay increases, and in some cases, promotions with accompanying back-dated pay increases; an agreement not to discriminate in the future; payment of attorney fees and costs to date; and a specified-sum payment for damages.

The district court invalidated the offers in part because actual dollar figures were not provided to the firefighters until after trial. The Fire Planning and Operations Manager of Knoxville calculated the value of the Rule 68 offers to the plaintiffs, if they had accepted them, up to the pay period ending January 29, 2000. The district court found that the pre-trial offers failed to set forth clearly defined terms upon which there could be a meeting of the minds. To buttress this conclusion, the court cited a phone call allegedly made by the firefighters' attorney to one of defendants' attorneys five days after the December 6, 1996, offer of judgment, and a letter sent to the defendants one day after the November 4, 1997, offer of judgment seeking to discuss the offer.

## B.  Defendants' Rule 68 Offers

Federal Rule of Civil Procedure 68 provides, in pertinent part, that "a party defending a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. . . .  If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer." Fed. R. Civ. P. 68.  In a § 1983 action, Rule 68 costs include the plaintiff's own attorney fees; thus, when the Rule 68 offer is ultimately greater than the award, the plaintiff may not recover attorney fees from the defendant. *Marek v. Chesny*, 473 U.S. 1, 11 (1985); *Mallory v. Eyrich*, 922 F.2d 1273, 1278 (6th Cir. 1991).  "Operation of Rule 68 is mandatory," and [t]he district court retains no discretion under Rule 68 to alter the rule's sometimes severe application." *Hopper v. Euclid Manor Nursing Home, Inc.,* 867 F.2d 291, 295 (6th Cir. 1989).

On December 6, 1996, the defendants made timely Rule 68 offers to each of the firefighters, and the firefighters rejected them.  On November 4, 1997, the defendants made second offers to all the firefighters except for W. Potter, and these too were rejected.  Only the jury awards in favor of Scarbrough and F. Potter exceeded the sums specified in the offers, and when the district court subsequently eliminated the transfer claim recoveries on statute of limitations grounds, the Rule 68 offers to each individual plaintiff exceeded each individual jury award.  The district court then ordered all the firefighters to pay the defendants' costs subsequent to December 6, 1996.  After the firefighters filed a second motion to alter or amend the judgment, the district court altered the previous ruling, adopted the firefighters' argument that the offers were void for vagueness, revoked the award of costs, declared the firefighters "prevailing parties" and granted their request for attorney fees.

A jury trial commenced on January 31, 2000, with the jury returning the following verdicts: Sharpe was awarded $2,500 in compensatory damages because Cureton and Ashe had retaliated against him for filing the complaint; however, he suffered no pre-complaint discrimination; W. Potter was found to have not suffered pre-complaint discrimination, but was awarded $6,500 in compensatory damages from Cureton and Ashe due to retaliation for filing the complaint; Scarbrough was awarded $6,500 in compensatory damages because Cureton and Ashe transferred him and denied a merit pay increase in retaliation for exercising his First Amendment rights, and the jury also found that Cureton retaliated against him for filing the complaint; F. Potter was awarded $7,500 in compensatory damages because Ashe transferred him in 1995 for retaliatory reasons, and Cureton and Ashe also retaliated against him for filing the complaint and denying a merit pay increase; finally, McGinnis was awarded $7,645 due to Cureton and Ashe's retaliation for filing the complaint and in transferring him for retaliatory reasons.

Additional evidence indicated that Ashe was observed crossing out the names of potential new KFD hires recommended by a committee and explained his actions by stating that the crossed-out names were the sons of firemen who had not done much for him during a recent election.  In addition, evidence indicated that Ashe had adjusted a promotion committee's 1988 recommendations so that they would promote those who had supported him.  Fireman Cummins had supported Ashe in the 1988 election, and the next year was promoted to be a deputy chief, but in 1991 Cummins supported Ashe's competitor and was not promoted thereafter.  In 1995, Cummins supported Harmon and was afterwards demoted to his former position and was refused a tuition reimbursement.

The defendants filed motions before, during, and at the close of trial for judgment as a matter of law on the transfer claims due to the statute of limitations.  The district court denied the defendants' motions and submitted the statute of

limitations issue to the jury, and a finding was reached that the claim was not barred. On February 16, 2000, the court entered judgment enforcing the jury's findings that Cureton and Ashe were liable in their individual capacities and that the City of Knoxville was liable only for the merit pay portion of Scarbrough and F. Potter's claims.[2]

After the Court's February 16 judgment, the plaintiffs filed a Rule 59(e) motion to alter or amend the judgment to call to the Court's attention that a ruling was still needed on W. Potter's FLSA claim. The plaintiffs also requested in this motion front pay, an injunction against future retaliation and discrimination, and a request for prejudgment interest. A hearing was held on March 28, 2000, and in an April 25, 2000, memorandum opinion, the district court denied the FLSA claim, as well as the request for front pay, an injunction, and prejudgment interest. Also in the court's April 25 opinion, it granted the defendants' renewed motion for a judgment as a matter of law on the transfer claims by finding that the statute of limitations barred these claims because the "continuing violation" doctrine did not apply. Consequently, Scarbrough's damages were reduced to $3,250; F. Potter's damages were reduced to $3,750, and McGinnis ultimately received $1 in nominal damages. On June 5, 2000, the firefighters filed a notice of appeal of the district court's May 8 judgment.[3]

Also after the district court's February 16, 2000, entry of judgment, the defendants filed a motion to tax Sharpe, W. Potter, and Scarbrough the costs of the action incurred by the

---

[2]The jury returned a special verdict that allocated damages as follows: Scarbrough received $3,250 for the transfer and $3,250 for the denial of merit pay; F. Potter received $3,750 for each retaliatory action; and McGinnis' entire award of $7,645 was for the illegal transfer.

[3]The district court inadvertently failed to enter judgment separately in accordance with Fed. R. Civ. P. 58 on April 25, leading to the judgment issued on May 8, 2000.

irreparable harm. The only post-suit retaliation alleged involved the January 1997, decision not to consider the plaintiffs for merit pay. The defendants consistently maintain that this decision, now made almost six years in the past, was on the advice of counsel due to the pending litigation. In addition, the merit pay system has been abolished in Knoxville since 1997, and there is thus little likelihood of future retaliation by merit pay decisions. The legal arguments of Ashe's counsel do not provide a factual predicate for likely future irreparable harm, nor does Ashe's refusal to issue a post-trial public apology, as the law does not require such a gesture by a defendant in order to avoid an injunction. The district court correctly emphasized in its initial decision denying the injunction the lack of a substantial likelihood of future injury given that: the firefighters were transferred back to their favored locations; Ashe was prohibited from seeking another term in office (and now has less than one year remaining in his last term), and Cureton is no longer available to carry out any retaliation orders due to his retirement. The district court's initial decision denying the injunction was correct. For the above reasons, the injunction is reversed as overly broad, and unnecessary in any event because the firefighters have failed to establish a sufficient likelihood of future harm, and that any future harm would be irreparable.[15]

---

[15]On the basis of *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992), we deny the firefighters' April 8, 2002, motion requesting the Court to consider certain newly emerged facts not considered by the district court. The firefighters' reliance upon the unpublished opinion of *Van Meter v. Shriver*, 1986 U.S. App. LEXIS 23006 (6th Cir. Feb. 6, 1986) is misplaced because that case involved new facts relating to justiciability and not the substantive merits of the action. *See Van Meter* at *4 ("this litigation bristles with difficult questions of standing, mootness, ripeness, comity, and federalism.").

had *in personam* jurisdiction; however, the operative question for review is the extent to which the class-wide injunction burdens Ashe. While district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an *individual suit*, such broad relief is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Aluminum Workers Int'l Union Local Union No. 215 v. Consol. Aluminum Corp*. 696 F.2d 437, 446 (6th Cir. 1982) ("Precisely because equitable relief is an extraordinary remedy to be cautiously granted, it follows that the scope of relief should be strictly tailored to accomplish only that which the situation specifically requires and which cannot be attained through legal remedy.")

The injunction issued by the district court is overly broad in that the class wide focus is completely unnecessary to provide the named plaintiffs the relief to which they are entitled as prevailing parties. *Cf. Brown v. Trustees of Boston University*, 891 F.2d 337 361 (1st Cir. 1989) ("An injunction should be narrowly tailored to give only the relief to which plaintiffs are entitled. Ordinarily, class-wide relief, such as the injunction here which prohibits sex discrimination against the class of Boston University faculty, is appropriate only where there is a properly certified class. . . . But there is no such reason here for an injunction running to the benefit of nonparties. Professor Brown's case established that she alone had been the victim of sex discrimination. The only permissible focus of the injunctive relief, therefore, would be on protecting her from further instances of sex discrimination or retaliation. . . .") (citations omitted). Regardless, the non-party class of firefighters established by the language of the injunction have access to the City's grievance process and the right to file suit to remedy any potential future harm without the necessity of an injunction.

The district court's decision to grant the injunction is not based upon a requisite factual showing of likely future

---

defendants after December 6, 1996, because these plaintiffs rejected the defendants' Rule 68 offer made on that day that turned out to be larger than the respective jury awards. In addition, the defendants requested that the court award costs incurred by them since November 4, 1997, the date of the Second Rule 68 Offer, and that the court award all of Pressley's costs at the expense of all the firefighters. After the court's decision to grant the defendants' motion for judgment as a matter of law reducing the jury awards, the defendants amended their motion for taxation of costs to request that Scarbrough and F. Potter be made liable for costs after December 6, 1996, since the Rule 68 offer made on that day turned out to be larger than the reduced verdict. On May 8, 2000, the court granted the defendants' requests for taxation of costs and the plaintiffs appeal this decision.

On May 22, 2000, the firefighters filed a second motion to alter or amend the judgment, requesting the district court to reconsider its findings regarding the statute of limitations, the need for an injunction, the dismissal of the FLSA claim, as well as the prejudgment interest and grant of taxation of costs. In a July 26, 2000, memorandum, the district court denied the motion in all respects, except for amending the prior judgment to grant the firefighters' request for an injunction, and to revoke the taxation of defendants' costs under Rule 68. The defendants appeal this Order granting an injunction against future political retaliation by Ashe, and the award to the firefighters of costs against the defendants as "prevailing parties."

Next, on August 8, 2000, the firefighters filed a motion to recover attorney fees in the amount of $365,716, later supplemented to reflect an additional $7,228 in fees incurred since the motion was filed. The district court granted the firefighters' request in part, reducing the total fee award to $241,287. In this Order, appealed by both sides, the district court also reaffirmed its grant of an injunction, and upheld the earlier ruling refusing to impose the defendants' costs on the firefighters pursuant to Rule 68.

Finally, on April 8, 2002, the firefighters filed a motion requesting this Court to consider new facts that had allegedly taken place. Specifically, the firefighters request the Court to consider the results of a grievance filed by a non-plaintiff employee of the Knoxville Fire Department, who complained that the City of Knoxville had discriminated against him in violation of his First Amendment rights of political belief and association.

## II.   FIREFIGHTERS' APPEAL[4]

### A.   District Court's Finding That The Continuing Violations Doctrine Does Not Apply To The Transfer Claims

We review the district court's grant of the defendants' motion for judgment as a matter of law *de novo*, applying the same standard that the district court applied: a court should grant the motion only if "in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 598 (6th Cir. 2001).

As an initial matter, the duration of the statute of limitations for § 1983 actions is governed by state law; however, federal standards govern when the statute begins to run. *See Wilson v. Garcia*, 471 U.S. 261, 267 (1985); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1986). Tennessee law provides for a one year statute of limitations for § 1983 actions. *See* Tenn. Code Ann. § 28-3-104(a)(3); *Berndt v. Tennessee*, 796 F.2d 879, 883 (6th Cir. 1986).

---

[4]The defendants' argument that the firefighters' appeal is untimely is rejected because orders or judgments establish the time for filing motions or an appeal, not memorandum opinions. Fed. R. Civ. P. 54(a); Fed. R. App. P. 4(a)(1)(A); *Associated Press v. Taft-Ingalls* Corp., 323 F.2d 114, 115 (6th Cir. 1963).

broader than necessary to remedy the constitutional violation." *Id.* at 1069 (citations omitted).

The district court issued the injunction only after the firefighters filed a motion to alter or amend the court's April 25, 2000, decision to deny the request for an injunction. The court originally denied the request by stating:

> In light of the fact that the plaintiffs are adequately protected by the laws and regulations of the City of Knoxville, that Mayor Ashe cannot serve as mayor beyond his current term, that former chief Bruce Cureton has retired, that Deputy Chief Pressley was found not to have violated any of the plaintiffs' civil rights, that plaintiffs, Frank Potter, Kenneth Scarbrough, and William McGinnis were transferred back to their favored stations in August, 1996 during the pendency of their civil service grievances, that the merit pay system has been discontinued, and that Mayor Ashe has conceded that it was wrong for him to transfer Frank Potter, the undersigned finds that the plaintiffs have not demonstrated a substantial likelihood of future injury for which injunctive relief is warranted.

The court below altered its ruling denying the injunction for the following stated reasons: in order to deter Ashe's future unconstitutional actions; due to the inadequacy of money damages; that Ashe has refused to admit the unconstitutionality of his actions; that future retaliation would not be grievable before the Civil Service Merit Board; due to evidence that Ashe had been engaging in similar discriminatory behavior from the beginning of his term; and evidence that a firefighter benefitted from political favoritism by a previous administration.

As an initial matter, the injunction grants class-wide relief to all Knoxville firefighters, despite the fact that the firefighters never sought nor received class certification. The injunction is limited to Ashe, over whom the court properly

because he asserted coverage under Section 7 of the FLSA is foreclosed.

Based upon the above reasoning, we affirm the district court's denial of the FLSA claim.

### III.  APPEAL OF CURETON, ASHE AND KNOXVILLE

#### A.   The District Court Injunction

The court below entered an injunction order stating as follows:

> Mayor Ashe is hereby enjoined from taking any adverse employment actions such as transfers, demotions, refusal to hire, refusal to promote, reduction of compensation or refusal to increase compensation of Knoxville Fire Department firefighters on account of their political beliefs and associations or their choice to remain neutral in political matters.  This injunction shall not apply, however, to any Knoxville Fire Department employees who are not covered by the city's civil service regulations.

We review the district court's decision to grant an injunction for abuse of discretion; legal conclusions leading to the injunction are reviewed *de novo*, and factual conclusions are reviewed for clear error. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998).  "Where the plaintiff establishes a constitutional violation after a trial on the merits, the plaintiff will be entitled to permanent injunctive relief upon showing 1) a continuing irreparable injury if the court fails to issue the injunction, and 2) the lack of an adequate remedy at law."  *Id. (*citations omitted*).*  The district court should grant an injunction only where the dilemma is ripe for judicial resolution, and "a matter is considered premature for judicial review when the alleged injury is speculative or may never occur."  *Id.* at 1068 (citations omitted).  Finally, the injunction "may be no

The discriminatory transfers that are the subject of this appeal occurred in September 1995, but the plaintiffs did not file suit until October 24, 1996.  Ordinarily, the "discovery rule" applies to establish the date on which the statute of limitations begins to run, *i.e.*, the date when the plaintiff knew or through the exercise of reasonable diligence should have known of the injury that forms the basis of his action.  *Sevier*, 742 F.2d at 273.  This test is an objective one, and the Court determines "what event should have alerted the typical lay person to protect his or her rights."  *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991).[5]

The district court properly concluded that reasonable minds could not differ that the firefighters had reason to know of the injuries caused by their transfers more than a year before they filed suit.  The fact that the firefighters were alerted to the need to protect their rights is evidenced by the October 2, 1995, grievances filed by the firefighters with the Knoxville Civil Service Merit Board, alleging that the transfers were in retaliation for the exercise of First Amendment rights.  Accordingly, the district court held that the firefighters' transfer claims were barred due to the fact that the statute of limitations was triggered more than a year preceding the October 24, 1996, date of the lawsuit.

In an effort to sidestep the one year Tennessee statute of limitations, the plaintiffs argue for application of the "continuing violation" doctrine in such a way as to toll the limitations period, rendering the transfer claims timely.  The Sixth Circuit has previously recognized two distinct categories of continuing violations, namely, those alleging serial violations and those identified with a longstanding and

---

[5] In the Title VII context, the Supreme Court has recently noted, without resolving, the accrual issue, specifically, "whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered." *National Railroad Passenger Corp. v. Morgan*, 122 S.Ct. 2061, 2073 n.7 (2002).  Here, even pursuant to the discovery rule, the plaintiffs' transfer claims remain time-barred.

demonstrable policy of discrimination.  *Compare Haithcock v. Frank*, 958 F.2d 671 (6th Cir. 1992) *with Alexander v. Local 496, Laborers' Int'l Union of North America*, 177 F.3d 394 (6th Cir. 1999).  Recent Sixth Circuit law summarizes the two categories as follows:

> The first category arises where there is some evidence of present discriminatory activity giving rise to a claim of continuing violation such as where an employer continues to presently imposes [sic] disparate work assignments or gives unequal pay for equal work . . . .  The second category of continuing violation arises where there has occurred a long-standing and demonstrable policy of discrimination.  This requires a showing by a preponderance of the evidence that some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure.

*Burzynski v. Cohen*, 264 F.3d 611, 618 (6th Cir. 2001) (internal quotations and citations omitted).

This Circuit employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions.  *See, e.g., LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1106 n.3 (6th Cir. 1995).  When a continuing violation is found, "a plaintiff is entitled to have the court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred."  *Alexander,* 177 F.3d at 408 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d. Cir. 1996)).  The firefighters submit several post-transfer allegedly discriminatory actions as evidence of a continuing violation, specifically, the denial of merit pay (announced in 1996), the refusal to consider plaintiffs for merit pay in 1996, and Ashe's refusal to return the firefighters to their preferred locations.

example from 29 C.F.R. § 778.325, *supra*).  *Aaron* found the City's method correct:

> The bi-weekly salaries found in the MOAs were intended to cover 112 hours of work for each pay period.  Therefore, the regular rate consisted of the MOA-designated bi-weekly salary divided by 112.  The MOA bi-weekly salary compensated the firefighters at that rate for up to 112 hours of work.  If a firefighter worked a total of 112 hours, some of those hours would be considered overtime hours, and therefore, the firefighters would also receive one-half the regular rate for each of those hours.  Any hours worked over 112 were all overtime hours and the firefighters would be entitled to one and one-half times the regular rate for those hours.  This pay scheme is clearly consistent with the FLSA regulations.

*Id.*

W. Potter's arguments confuse the concepts of overtime premiums with overtime hours.  Further, his reliance upon *Knoxville v. Popejoy*, 1991 Tenn. App. LEXIS 996 (Tenn. Ct. App. Dec. 31, 1991) is misplaced because that case involved review of an administrative interpretation of a City Charter provision under the arbitrary and capricious standard, and did not interpret the FLSA.  W. Potter has not identified authority indicating that an unconsented transfer to a lower hourly rate is illegal.  The record is devoid of evidence indicating that the City of Knoxville reduced W. Potter's pay "so as to nullify the effect of extending the [FLSA's] coverage."  *Cf. Blanton v. Murfreesboro*, 856 F.2d 731, 736 (6th Cir. 1988).  W. Potter received higher pay due to the City's choice not to utilize the Section 207(k) exemption than he received in his prior position as an administrator.  In addition, he received higher pay in the transferred position than other similarly situated firefighters.  Thus, any claim by W. Potter that the city discriminated against him with respect to his wages

was $5 per hour–indicating that the divisor was 55 rather than 40).[14]

W. Potter's argument is legally indistinguishable from other firefighters' arguments rejected in *Aaron v. City of Wichita*, 54 F.3d 652 (10th Cir. 1995). In *Aaron*, the firefighters worked an average of 56 hours per week, or 112 hours bi-weekly, and though they were paid based on the number of hours they worked, the hourly rate was based on a designated "base salary" established in a collectively bargained Memorandums of Agreements ("MOAs"). The MOAs contained pay schedules indicating both bi-weekly salaries and hourly rates, the latter computed on the assumption that the bi-weekly salaries were intended to compensate 112 hours. The *Aaron* firefighters argued that the bi-weekly salary was intended to compensate 80 hours, but the City maintained that the MOAs' practice of using 112 hours to calculate the regular rate was in compliance with the FLSA.

The district court in *Aaron* held that the City's method was wrong, "because overtime hours could not be used in calculating the regular rate. *Id.* at 655. The Tenth Circuit held, however, that "[t]his interpretation is clearly inconsistent with FLSA regulations," because "[t]he regulations provide that a base salary used to calculate a regular rate can be intended to cover more than 40 hours in one week and the regulations illustrate how to deal with the calculation of the regular rate in such a case." *Id.* (citing the

---

[14]*See also 149 Madison Ave. Corp.*, 331 U.S. at 204 ("Section 7(a) of the Act requires . . . that any wage agreement falling within its purview must establish an hourly 'regular rate' not less than the statutory minimum and provide for overtime payments of at least one and one-half times the 'regular rate.' A wage plan is not rendered invalid simply because, instead of stating directly an hourly rate of pay in an amount consistent with the statutory requirements, the parties have seen fit to stipulate a weekly wage inclusive of regular and overtime compensation for a workweek in excess of 40 hours and have provided a formula whereby the appropriate hourly rate may be derived therefrom.").

Previous "continuing violation" law must be reexamined in light of the Supreme Court's recently imposed limits on the viability of the doctrine. In *National Railroad Passenger Corp. v. Morgan*, 122 S.Ct. 2061, 2070 (2002), the Court held that when an employee seeks redress for discrete acts of discrimination or retaliation, the continuing violation doctrine may not be invoked to allow recovery for acts that occurred outside the filing period. *Id.* at 2072. According to the Supreme Court, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* In contrast, hostile environment claims involve unlawful employment practices that cannot be said to occur on any particular day, but occur over a series of days or years. *Id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

*Morgan* explained, in direct language:

[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.

*Id.* at 2072.

We can find no principled basis upon which to restrict *Morgan* to Title VII claims, and we therefore conclude that the Supreme Court's reasoning must be applied to the

firefighter's § 1983 claims.[6]   The Supreme Court has previously determined that the Title VII administrative charge period is functionally equivalent to a statute of limitations. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393-95 (1982). We are unable to find that the policy justifications for Tennessee's legislative choice to establish a one year statute of limitations period as applicable to § 1983 claims are any less important than the congressional directive set forth in 42 U.S.C. § 2000e-5(e)(1), requiring the prompt filing of Title VII claims.[7]  *See Hargraves v. Brackett Stripping Machine Co., Inc.*, 317 F. Supp. 676, 683 (E.D. Tenn. 1970) (holding that the one-year Tennessee statute of limitations does not violate the Due Process Clause as arbitrary and capricious). Moreover, the continuing violation doctrine arose in the context of the "obviously quite short deadlines"[8] set forth in

---

[6]This Circuit has recently found *Morgan's* construction of the continuing violation doctrine equally applicable to claims of age discrimination and retaliation brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.  See Sherman v. Chrysler Corp.,* No. 00-2287, 2002 WL 31074591 (6th Cir. Sept. 6, 2002). Similarly, a district court in this Circuit recently held that *Morgan* likewise applies to continuing violation claims under 42 U.S.C. § 1981. *See Kinley v. Norfolk Southern Railway Co.*, No. Civ. A.1999-130, 2002 WL 31499269 (E.D. Ky. Sept. 26, 2002).

[7]"[S]trict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Morgan*, 122 S.Ct. at 2070 (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)).  Strict adherence to the procedural requirements specified by the Tennessee legislature similarly guarantees evenhanded administration of the law.  *See Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 523 (6th Cir. 1997 ) ("To allow damages for the entire period during which a law is in effect when a plaintiff challenges the law long after it was enacted would frustrate [the purposes of the statute of limitations]. Instead, just as a new injury was allegedly inflicted on [the plaintiff] each day that [the offending law] was in effect, a new limitations period began to run each day as to that day's damage.") (citation omitted).

[8]*Morgan*, 122 S.Ct. at 2070 (citing *Mohasco*, 447 U.S. at 825).

---

rate at which he is employed."   29 U.S.C. § 207(a)(1). "Regular rate" is a term of art under the FLSA, defined as:

> The "regular rate" of pay under the Act cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee; it must be drawn from what happens under the employment contract (*Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446 [(1948)]).  The Supreme Court has described it as the hourly rate actually paid the employee for the normal non-overtime workweek for which he is employed–an "actual fact." (citation omitted).

29 C.F.R. § 778.108; *see also 149 Madison Ave. Corp v. Asselta*, 331 U.S. 199, 204 (1947).

The method of calculating the regular rate is as follows: "[t]he 'regular rate' under the Act is a rate per hour," though "[t]he Act does not require employers to compensate employees on an hourly rate basis. . . ." *Id*. § 778.109. "The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment . . . in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." *Id*. "Where the salary covers a period longer than a workweek, such as a month, it must be reduced to its workweek equivalent. . . . A semimonthly salary is translated into its equivalent weekly wage by multiplying by 24 and dividing by 52." *Id*. § 778.13(b). After calculating the workweek equivalent, the employee's "regular hourly rate of pay, on which time-and-half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate." *Id*. § 778.113(a). Importantly, the "number of hours which the salary is intended to compensate" does not have to be 40 hours; instead, this is a number that is determined by the parties' actual practice. *See, e.g., id.* § 778.325 (providing an example of an acceptable scheme, in which an employee was hired at a fixed salary of $275 for 55 hours of work and his regular rate for purposes of overtime

18   *Sharpe, et al. v.*
*Cureton, et al.*
          Nos. 00-5805/6089/6361/6362

The Fire Department typically determines the number of hours worked for purposes of computing overtime compensation by applying section 207(k) of the FLSA, which exempts fire departments from overtime compensation until the number of hours worked exceeds 212 hours in each 28-day work period. 29 U.S.C. § 207(k). The Fire Department chose not to apply the Section 207(k) exemption to W. Potter when it paid him overtime as Shift Chief; instead, it paid him time-and-a-half at the $15.18 rate for all hours he worked over 40. The result was that W. Potter made more money than the other two Deputy Chiefs who had identical duties. For example, Duputy Chief Palmer was paid $86,645 during the same period that W. Potter was paid $106,674.[13]

W. Potter argues that the Fire Department should have applied the Section 207(k) exemption, and that this would have resulted in a higher hourly rate. According to the Fire Department's method, his bi-weekly base salary was divided by the average number of hours he worked in each bi-weekly period (160), thus arriving at a $15.18 regular rate, plus 64 hours at the time-and-half rate of $22.77, resulting in a total pay per cycle of $3,886.08. In contrast, W. Potter's method calls for dividing his bi-weekly base salary by 80 hours per week, thus arriving at a $21.25 regular rate for 212 regular hours, plus 12 hours at the time-and-a-half rate of $31.88, resulting in pay each cycle of $4,887.56.

The FLSA establishes that employers cannot make employees work more than a specified number of hours per week "unless such employee receives compensation for his employment in excess of [40 hours, unless otherwise provided for,] at a rate not less than one and one-half times the regular

---

paying him time-and-a-half for all overtime (based on the $15.18 rate), including a lump sum of back pay overtime beginning February 1, when he had moved into the position.

[13] The Fire Department transferred W. Potter back to a 40-hour job in October, 1997.

Nos. 00-5805/6089/6361/6362
          *Sharpe, et al. v.*   15
          *Cureton, et al.*

Title VII, and the relatively longer limitations periods provided by states for § 1983 actions reinforces as a policy matter *Morgan's* applicability to these claims.[9] *See Wilson*, 471 U.S. at 279 ("It is most unlikely that the period of limitations applicable to [§ 1983 claims] ever was, or ever would be, fixed in a way that would discriminate against federal claims, or be inconsistent with federal law in any respect.").

It cannot reasonably be disputed that the firefighters' claims involve discrete acts and not a hostile environment, as they were made aware of the retaliatory transfers on specific dates in September 1995. The serial violations component of the continuing violations doctrine employed by this Court is sufficiently analogous to the Ninth Circuit line of cases struck down in *Morgan*. *Tenenbaum v. Caldera*, Nos. 00-2394, 01-1704, 2002 WL 2026347, at *3 (6th Cir. Aug. 29, 2002). Accordingly, *Morgan* overturns prior Sixth Circuit law addressing serial violations, *i.e.*, plaintiffs are now precluded from establishing a continuing violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period.

The second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, is not implicated by *Morgan*. *Tenenbaum*, 2002 WL 2026347, at *2 n.3. To establish this category of continuing violation, "appellant must demonstrate something more than the existence of discriminatory treatment in his case." *Haithcock*, 958 F.2d at 679 (citing a discriminatory policy appearing in a statute or an affirmative action plan as examples of this second category). "The preponderance of the evidence must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's

---

[9] *See* Douglas Laycock, *Continuing Violations, Disparate Impact in Compensation, and Other Title VII Issues*, 49 Law & Contemp. Probs. 53, 56 (1986).

standing operating procedure." *EEOC v. Penton Indus. Publishing Co.*, 851 F.2d 835, 838 (6th Cir. 1988) (citations omitted). Here, the plaintiffs do not represent a class, and have otherwise failed to allege class-wide discriminatory action.[10] The plaintiffs broadly allege, "Ashe's disregard to constitutional rights spans three decades impacting more than these plaintiffs . . . ." This allegation is not sufficiently supported by the record. Knoxville consistently employs over 300 firefighters and over 1600 total city employees, but plaintiffs called at trial merely one other retired firefighter who testified concerning allegations of patronage practices occurring in the late 1980's. This proof is insufficient as a matter of law for plaintiffs to meet their burden of showing a three-decade-long "standing operating procedure" of discrimination. Instead, the plaintiffs proved the existence of discriminatory treatment in their case, but this is inadequate to invoke the "longstanding and demonstrable policy of discrimination" continuing violation exception.[11]

Accordingly, we affirm the district court's finding that the continuing violation doctrine does not apply, although based upon the different reasons stated above.

**B.   W. Potter's FLSA Claim**

We review the district court's factual findings regarding this claim against the City of Knoxville for clear error, and its findings of law *de novo. Brock v. City of Cincinnati*, 236 F.3d 793, 800 (6th Cir. 2001). The FLSA became applicable to the Knoxville Fire Department in April, 1996, and since

---

[10]*See infra*, section III. A. (discussing the injunction).

[11]As the plaintiffs have declined to argue equitable tolling or estoppel either before or after the announcement of *Morgan*, we have no reason to consider whether *Morgan's* limited endorsement of these equitable doctrines extend to the § 1983 context. *See Morgan*, 122 S.Ct. at 2072 (citing *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 (1984)) (per curiam).

that time each uniformed member of the Knoxville Fire Department has been compensated by payment of an annual base salary paid in equal bi-weekly installments, and an hourly rate of pay is derived for purposes of determining the regular rate of pay used in computing overtime compensation.

In April 1996, W. Potter was a Deputy Chief in the firefighting division and worked an average of 56 hours a week. In his shift schedule he worked a maximum of ten and a minimum of nine 24-hour shifts in a 28-day work period. During this time, the Fire Department calculated his hourly rate for purposes of overtime by taking his annual salary and dividing that by 26 (since he was paid bi-weekly), to derive a bi-weekly amount. The bi-weekly amount was then divided by the total number of scheduled hours of work in the bi-weekly pay period. Based upon these calculations, when W. Potter worked ten twenty-four hour shifts, his bi-weekly average was 120 hours, and when he worked nine twenty-four hour shifts, his bi-weekly average was 108 hours.

In September of 1987, W. Potter was transferred to the administrative division and became a Deputy Chief there, working 40 hours per week, and not working any overtime. On September 26, 1995, he was transferred to a new position at which he continued to work 40 hours per week, receiving the same base salary as before, an effective hourly rate of $21.25 per hour. On February 1, 1996, he was transferred to become a shift chief in the firefighting division, which essentially involved reassuming his 1986 position. In this position, he retained his same annual base salary, and his overtime was calculated in the same method as it had been in 1986. This meant that when he worked ten 24-hour shifts his hourly rate for overtime was $15.74, averaging out to $15.18.[12]

---

[12]When W. Potter first moved to this Shift Chief position, the Fire Department did not pay him any overtime, and instead simply paid him the same salary he had received as an administrator without any enhancement. In April, 1996, the Fire Department corrected this error by