Hon. _____

Dated: _____

Theresa BASSETT, Carol Kennedy, Peter Ways, Joe Breakey, JoLinda Jach, Barbara Ramber, Doak Bloss, Gerardo Ascheri, Michelle Johnson, and Denise Miller, Plaintiffs,

v.

Governor Richard SNYDER, Defendant.

Case No. 12–10038.

United States District Court, E.D. Michigan, Southern Division.

June 28, 2013.

Amanda C. Goad, American Civil Liberties Union Foundation, New York, NY, Amy E. Crawford, Bradley H. Weidenhammer, Donna M. Welch, Kirkland & Ellis LLP, John A. Knight, American Civil Liberties Union Foundation LGBT & Aids Project, Chicago, IL, Jay Kaplan, Michael J. Steinberg, American Civil Liberties Union Fund of Michigan, Detroit, MI, for Plaintiffs.

Margaret A. Nelson, Mark E. Donnelly, Michigan Department of Attorney General, Lansing, MI, for Defendant.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DAVID M. LAWSON, District Judge.

The plaintiffs in this case are five same-sex couples who allege that Michigan Pub-

lic Act 297 (2011) is unconstitutional because it violates their rights under the Equal Protection and Due Process Clauses. Public Act 297 prohibits public employers from providing medical and other fringe benefits to any person cohabitating with a public employee unless that person is legally married to the employee, or is a legal dependent, or eligible to inherit under the State's intestacy laws. The plaintiffs allege that the primary purpose of the law is to prohibit public employers from furnishing benefits to the same-sex partners of their employees, and therefore the Act denies their right to equal protection because it contains a discriminatory classification on the basis of sex and sexual orientation and is not rationally related to a legitimate state interest. The plaintiffs also argue that the act impermissibly burdens their fundamental right to intimate association and therefore violates their substantive due process rights. Many of the plaintiffs who are in relationships with public employees but not so employed themselves have lost their medical benefits, and the rest will do so shortly. They have moved for a preliminary injunction to prevent enforcement of the law.

The defendant—Michigan's Governor—opposes the preliminary injunction and has filed a motion to dismiss, arguing that the Court should abstain from exercising jurisdiction, the plaintiffs lack standing, the plaintiffs' claims are not ripe, and the plaintiffs have failed to plead either an equal protection or a substantive due process claim upon which relief can be granted. The Court heard oral argument on both motions on August 7, 2012. Thereafter, the Court allowed the parties to file supplemental briefs concerning the scope of the remedies available. The Court now finds that the plaintiffs have standing to assert their constitutional claims; the claims are ripe, and abstention is not appropriate. The Court also finds that the

plaintiffs have not stated a viable substantive due process claim.

The equal protection claim is another matter. The plaintiffs argue that although Public Act 297 does not mention same-sex unions or describe same-sex partner benefits by name, the intended purpose of the law is to discriminate against same-sex couples on the basis of their sexual orientation without actually saying so. The defendant contends that the Act has no such purpose; instead, the intention behind passage of the law was to save money by restricting the scope of public employee benefits. The Court finds that the plaintiffs have stated a plausible claim that the law violates the Equal Protection Clause when the rational basis for the benefits limitations is fairly analyzed, and they have shown a likelihood of succeeding on that claim. The other relevant factors plainly militate in favor of a preliminary injunction barring enforcement of the law. Therefore, the Court will grant in part and deny in part the defendant's motion to dismiss, and grant the plaintiffs' motion for a preliminary injunction.

## I.

### A.

The plaintiffs in this case are five same-sex couples who have lived together in long-term relationships, residing in various Michigan communities. One domestic partner of each of the couples works for a public employer, such as a county, city, or school district. Those public employers provide fringe benefits, such as medical coverage, and historically have extended coverage to the domestic partners of the plaintiff-couples under the various collective bargaining agreements between the governmental units and their employees. Each of the public-employee plaintiffs is a skilled employee whose job duties are

equivalent to the duties of their heterosexual colleagues. They each have enjoyed a long-term, committed, and financially interdependent relationship with their respective domestic partner and would marry if Michigan law permitted same-sex couples to marry.

According to the complaint, before 2004, a number of Michigan public employers voluntarily provided health insurance benefits to same-sex domestic partners. In 2004, the Michigan constitution was amended to include article I, section 25, which states: "To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose." Mich. Const. Art. 1, § 25 [hereinafter "the marriage amendment"]. In 2005, then Michigan attorney general Michael Cox issued an opinion on the City of Kalamazoo's domestic partner benefits allowance. Cox opined that although the provision of benefits to same-sex domestic partners was not itself unlawful, state and local governments could not provide those benefits on the basis of a relationship "characterized by reference to the attributes of a marriage." Constitutionality of City Providing Same–Sex Domestic Partnership Benefits, Mich. Att'y Gen. Op. 7171 (Mar. 16, 2005), *available at* http://www.ag.state.mi.us/opinion/datafiles/2000s/op10247.htm (last visited May 31, 2013).

In 2006, a union group, various public employees, and their domestic partners filed a lawsuit seeking a declaratory ruling that the marriage amendment did not prohibit public employers from offering benefits to same-sex domestic partners. The Michigan Court of Appeals found that the plans instituted by government agencies offering same-sex domestic partner benefits established eligibility criteria similar to marriage. *National Pride At Work, Inc. v. Governor of Michigan,* 274 Mich.App. 147, 164, 732 N.W.2d 139, 151 (2007). The court held that extending benefits to same sex domestic partners on that basis violated the marriage amendment's ban on recognizing a "similar union," but that "[t]he amendment as written does not preclude the extension of employment benefits to unmarried partners on a basis unrelated to recognition of their agreed-upon relationship." *Id.* at 165, 172, 732 N.W.2d at 151, 155.

The Michigan Supreme Court affirmed the court of appeals' decision. *National Pride At Work, Inc. v. Governor of Michigan,* 481 Mich. 56, 748 N.W.2d 524 (2008). The court reasoned that the requirements of the benefit plans at issue that partners be of a certain sex—the same sex as their partner—and not be closely related by blood were so similar to the requirements for marriage as to constitute a "similar union" that could not be recognized by public employers. *Id.* at 86–87, 748 N.W.2d at 543.

As a result of those holdings, some public employers, including the publicly-employed plaintiffs' employers, revised their employee benefits plans. The City of Kalamazoo, the Ann Arbor Public Schools, and Ingham County all adopted benefit plans that permit employees to designate a person with whom he or she lives and, with the exception of the City of Kalamazoo, shares finances as an "Other Qualified Adult" (OQA), entitled to receive benefits. Those plans also require that the OQA not be eligible to inherit from the employee, be related to the employee by blood in a degree of closeness that would prohibit marriage in Michigan, and not otherwise be eligible for benefits from the public employer. The OQA could be of either sex. Other public employers that do not have employees involved in this suit but

provide a similar program include the City of Ann Arbor, Washtenaw and Eaton Counties, the school districts of Birmingham and Farmington, and Kalamazoo Valley and Lansing Community Colleges.

In January 2011, the Michigan Civil Service Commission, which is granted plenary power to regulate compensation for state employees by the Michigan constitution, announced that it had decided to extend health care benefits to certain adult co-residents of state employees. Some state legislators issued press releases condemning that decision, characterizing it as an extension of health benefits to same-sex partners of state employees. On June 16, 2011, Representatives David Agema and Peter Lund, among others, introduced House Bill No. 4770, the Public Employee Domestic Partner Benefit Restriction Act. HB-4770, As Passed House, September 15, 2011, *available at* http://www. legislature.mi.gov/documents/2011–2012/ billengrossed/House/htm/2011–HEBH– 4770.htm (last visited May 31, 2013). The Bill passed both houses of the Michigan Legislature and was signed by the defendant on December 22, 2011. It became effective on the same date. The governor's signing statement states that the law does not extend to university employees or state employees under civil service. The Act reads, in relevant part:

> Sec. 3. (1) A public employer shall not provide medical benefits or other fringe benefits for an individual currently residing in the same residence as a public employee, if the individual is not 1 or more of the following:
>
> (a) Married to the employee.
>
> (b) A dependent of the employee, as defined in the internal revenue code of 1986.
>
> (c) Otherwise eligible to inherit from the employee under the laws of intestate succession in this state.

> (2) A provision in a contract entered into after the effective date of this act that conflicts with the requirements of this act is void.

> Sec. 4. If a collective bargaining agreement or other contract that is inconsistent with section 3 is in effect for a public employee on the effective date of this act, section 3 does not apply to that group of employees until the collective bargaining agreement or other contract expires or is amended, extended, or renewed.

2011 Mich. Pub. Acts 297; Mich. Comp. Laws §§ 15.583–.584.

## B.

According to the complaint and the affidavits filed in support of the motion for preliminary injunction, the five same-sex couples who are the plaintiffs in this case have been involved in long-standing, committed relationships. Theresa Bassett and Carol Kennedy celebrated their twenty-sixth anniversary in November 2012. They had a commitment ceremony in Michigan in 1990, registered as domestic partners in Ann Arbor the same year, and were legally married in California in 2008. They are raising six children between the ages of six and twenty. Bassett is a middle school teacher at Slauson Middle School in Ann Arbor with duties similar to heterosexual teachers; Kennedy is self-employed and runs a day care from the couple's home. Kennedy does not have access to an employer-provided health care plan; she is currently covered under Bassett's insurance as an "Other Eligible Adult."

Peter Ways and Joe Breaky have been partners for twenty-one years. They held a commitment ceremony in 1998 and affirm that they would marry if Michigan law permitted it. The couple is raising a nine-year-old daughter. Ways has worked as a

teacher in the Ann Arbor Public Schools for eleven years and has duties similar to heterosexual teachers; Breaky is a social worker who operates his private practice from the couple's home. Breaky does not have access to employer-provided health care; he is currently covered under Ways's insurance as an "Other Eligible Adult."

JoLinda Jach and Barbara Ramber have been partners for seventeen years. They held a commitment ceremony in 1997 and aver that they would marry if Michigan law permitted it. The couple is raising two children. Jach has worked as a systems analyst for the City of Kalamazoo for twenty-four years and has duties similar to heterosexual senior systems analysts; Ramber works part-time in the food service division of Kalamazoo Public Schools. Ramber does not have access to health insurance as a part-time employee, and she lost coverage under Jach's insurance on December 31, 2012.

Doak Bloss and Gerardo Ascheri have been partners for eighteen years and state that they would marry if Michigan law permitted it. Bloss is the Health Equity and Social Justice Coordinator for Ingham County and has responsibilities similar to the heterosexual Environmental Justice Coordinator for the county; Ascheri teaches piano from the couple's home. Ascheri does not have access to employer-provided health insurance; he lost coverage under Bloss's insurance on December 31, 2012.

Denise Miller and Michelle Johnson have been partners for eight years. They held a commitment ceremony in 2004. Miller teaches at Kalamazoo Valley Community College and has duties similar to heterosexual teachers; Johnson is the Executive Director of a nonprofit organization. Johnson does not have access to employer-provided health insurance. She was previously covered by Miller's plan but lost her benefits after Public Act 297 passed.

### C.

The plaintiffs filed their initial complaint on January 5, 2012. The complaint contained three counts: an equal protection claim based on sexual orientation and sex, a substantive due process claim, and a "claim" for declaratory and injunctive relief. The plaintiffs filed an amended complaint on February 17, 2012 with the same claims and additional plaintiffs.

The defendant did not file an answer to the amended complaint initially; instead, the defendant filed a motion to dismiss, followed a few days later by an amended motion to dismiss. The defendant filed an answer to the amended complaint on March 22, 2012.

The plaintiffs filed a motion for a preliminary injunction, which the defendant opposes. The motion and response are supported by factual affidavits. The Court held a hearing at which some of the plaintiffs testified on August 7, 2012. Both parties filed supplemental briefs addressing appropriate remedies on August 21, 2012.

### II.

The motion to dismiss and the motion for preliminary injunction raise many overlapping legal issues. The motion to dismiss, however, includes a challenge to subject matter jurisdiction, which, of course, the Court must address at the outset.

### A.

■ The defendant contends that the plaintiffs lack standing to assert their claims, and therefore the Court does not have subject matter jurisdiction over a live controversy. Standing is required in order to confer subject matter jurisdiction

upon federal courts under Article III of the Constitution. It is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Supreme Court has stated that the standing requirement "limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into 'a vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915–16 (6th Cir.2002) (quoting *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

■■■ There are three constitutional requirements for standing. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *City of Cleveland v. Ohio*, 508 F.3d 827, 835 (6th Cir.2007). "To establish Article III standing, a litigant must show (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) that the injury will likely be redressed by a favorable decision." *Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir.2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In addition, a plaintiff must also satisfy three prudential standing requirements. *See City of Cleveland*, 508 F.3d at 835. First, a plaintiff must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499, 95 S.Ct. 2197 (citations omitted). Second, "a plaintiff's claim must be more than a 'generalized grievance' that is pervasively shared by a large class of citizens." *Coal Operators*, 291 F.3d at 916 (quoting *Valley Forge*, 454 U.S. at 474–75, 102 S.Ct.

752). Third, in statutory cases, the plaintiff's claim must fall within the "zone of interests" regulated by the statute in question. *Ibid.* "These additional restrictions enforce the principle that, 'as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted.'" *Ibid.* (quoting *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 576 (6th Cir.1991)).

The defendant argues that the plaintiffs do not satisfy the constitutional standing requirements because, except for plaintiffs Miller and Johnson, none of them have lost medical benefits and they have not pleaded facts establishing an injury that is concrete, objective, and palpable. The defendant also contends that the plaintiffs cannot show a causal relationship between Public Act 297 and any harm they have suffered. Because the plaintiffs cannot show an injury or causation, the defendant reasons, they also cannot demonstrate that a favorable decision is likely to redress their injury. The defendant argues that the plaintiffs cannot satisfy the prudential requirement because they are attempting to assert claims on behalf of their respective partners. The Court will discuss each of these arguments.

1.

■■■ It is the plaintiffs' obligation to allege an injury that he or she has suffered that is "(a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical." *Ailor v. City of Maynardville*, 368 F.3d 587, 596 (6th Cir. 2004). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, [the Court] 'presumes that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Lujan v. Na-*

*tional Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). In *Lujan v. Defenders of Wildlife,* the Supreme Court explained that such an injury, if it had not already occurred, must be "imminent," that is, likely to occur immediately. *Id.* at 564, 112 S.Ct. 2130.

▮ The plaintiffs among them have shown both actual and imminent injuries. Carol Kennedy has alleged that she does not have access to an employer-provided health care plan except through her partner, Theresa Bassett. She will lose her health insurance when Bassett's union contract with the Ann Arbor Public Schools ends if Public Act 297 remains in effect. Kennedy has a family history of breast cancer and finding replacement insurance will be expensive. Likewise, Joe Breaky does not have access to employer-provided health care, and he will lose insurance when Peter Ways's contract with Ann Arbor Public Schools expires if Public Act 297 remains in effect. Breaky says that replacement insurance for him will cost between $8,000 and $10,000 per year. Barbara Ramber does not have access to health insurance as a part-time employee. She lost health care coverage through her partner, JoLinda Jach, on December 31, 2012 because of Public Act 297. Ramber has serious problems with her left eye that require daily medication and has been diagnosed with rheumatoid arthritis and gastroesophageal reflux disease, which requires medication and may require a series of endoscopy procedures; alternative health coverage would be difficult to obtain and purchasing coverage from her employer would cost more than half of Ramber's monthly take-home pay. Gerardo Ascheri does not have access to employer-provided health insurance; he lost his health care coverage through Doak Bloss on December 31, 2012 because of Public Act 297. Ascheri alleges that he has high blood pressure and high cholesterol, for which he takes medication. Michelle Johnson previously was covered by Denise Miller's health care plan, but she lost her benefits after Public Act 297 passed. Johnson has non-malignant uterine fibroid tumors that may require surgery, fibrous breast tissue that requires yearly monitoring, and a family history of aneurysm that requires that she have regular scans.

In addition to establishing a present actual injury, the plaintiffs have shown imminent injury—"that the threatened injury is certainly impending." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal quotation omitted). Although some of the plaintiffs have not yet lost their health care coverage, that fate is inevitable, as illustrated by some of the co-plaintiffs. As the Sixth Circuit has noted, "[i]mminence is a function of probability," and the relevant inquiry is whether a future injury is likely to occur, not when it will occur. *Thomas More Law Center v. Obama,* 651 F.3d 529, 536 (6th Cir.2011), *abrogated with respect to other principles by National Federation of Independent Business v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012).

In *Thomas More Law Center,* the Sixth Circuit considered a challenge to the standing of plaintiffs seeking to overturn the Affordable Care Act. In that case, the Court determined that the plaintiffs had alleged an imminent future injury because they would be required to purchase health care coverage as of the effective date of the Act, which was three and a half years after the complaint was filed. *Id.* at 538. A similar rationale applies here. The plaintiffs have alleged that they will lose health coverage when their partners' contracts expire or are renegotiated; Public Act 297 states as much. "The Act itself

proves they will [lose health coverage] when the time comes," *ibid.*, that is, when the publicly-employed partners' contracts expire or are renegotiated. As to the publicly-employed partner plaintiffs, the complaint alleges that family health insurance coverage is part of the compensation extended to public employees, including the publicly-employed plaintiffs, and that the publicly-employed plaintiffs have lost or will lose family health insurance coverage for their domestic partners. Am. Compl. ¶¶ 1, 2, 9. A reduction in compensation is sufficient to establish an injury for the purpose of standing. *See Williams v. Boeing Co.*, 517 F.3d 1120, 1127 (9th Cir.2008) (finding allegations that discrimination had led to reduced pay for African–Americans sufficient to establish an injury for standing purposes); *American Federation of Government Employees, Local 2119 v. Cohen*, 171 F.3d 460, 466 (7th Cir.1999) (finding that a loss of job benefits, including lower pay and retirement benefits, was a concrete and particularized injury for constitutional standing purposes). The plaintiffs have plausibly alleged that they are the "objects" of Public Act 297, which prohibits local governments from offering them domestic partner health insurance, and that they have suffered a concrete and particularized injury.

### 2.

The defendant's argument that the plaintiffs cannot show a causal relationship is based on the notion that they have not pleaded facts suggesting that their impending loss of benefits is related to Public Act 297. The defendant points out, for instance, that the plaintiffs cannot say when they might lose benefits, and that they could lose benefits because the publicly-employed partners lose their jobs or the partners separate.

The first argument has no traction. The plaintiffs' complaint alleges that Public Act 297 prohibits local governments from providing the domestic partner benefits that the plaintiffs have obtained, that under the terms of the Act coverage is terminated when the contracts or collective bargaining agreements in place when the Act took effect expire, and that the non-publicly employed plaintiffs will lose their benefits if the Act remains effective. Am. Compl. ¶¶ 9, 82. It is difficult to imagine what other facts the plaintiffs might plead to demonstrate that the termination of their benefits is related to the enforcement of Public Act 297. The defendant's argument that the plaintiffs have not pleaded facts demonstrating that Public Act 297 is related to the termination of their benefits is perplexing, as it is admittedly the purpose of the Act to terminate the benefits that the plaintiffs currently receive. Moreover, the amended complaint alleges that one plaintiff has lost benefits; the plaintiffs have presented affidavits from two other plaintiffs stating that they would lose their benefits on December 31, 2012, which date has passed.

As for the second argument, although it is certainly possible that the plaintiff couples could separate or the publicly-employed plaintiffs could lose their jobs before losing health insurance benefits, those anything-can-happen scenarios do not undermine the alleged causal relationship between the defendant's conduct and the harm alleged. In *Thomas More Law Center*, the Sixth Circuit considered arguments that the plaintiffs did not have standing to challenge the Affordable Care Act's mandatory insurance provision, which does not come into effect until 2014, because the plaintiffs might die, their incomes might fall, or "a disaster could befall them" that would make them eligible for a hardship exception. *Thomas More Law Center*, 651 F.3d at 537. The Sixth Circuit, noting that the Supreme Court has

allowed plaintiffs to challenge laws prior to their effective dates, found that these events were "hardly probable and not the kind of future developments that enter into the imminence inquiry." *Ibid.* Similarly, here, it is "hardly probable" that the plaintiffs will end their long-term relationships or lose their jobs before losing benefits—especially those plaintiffs who have already lost benefits. The defendant has presented no reason to believe that those contingencies are likely to occur; the invocation of remote possibilities is insufficient to strip the plaintiffs of standing.

3.

■ Finally, the defendant argues that, to the extent that any individual plaintiff has standing, that plaintiff cannot assert claims on behalf of his or her partner. The defendant argues that the plaintiffs do not meet the prudential standing requirement that plaintiffs must assert their own legal rights and interests, rather than the rights of third parties. Those general propositions certainly are true, but the authorities the defendant cites to apply them to the plaintiffs in this case are readily distinguished.

The defendant mainly relies on *Kowalski v. Tesmer,* 543 U.S. 125, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004), in which the Supreme Court held that attorneys could not bring claims on behalf of hypothetical future clients who might be denied appellate counsel. *Id.* at 134, 125 S.Ct. 564. The Court held that the lawyers did not satisfy the first prudential standing requirement because, unlike the plaintiffs here, they explicitly sought to enforce the rights of third parties. In other cases in which this concern has been implicated, the plaintiffs have either explicitly sought to assert the rights of third parties or identified injuries that were not caused by the alleged violation. *See Boland v. Holder,* 682 F.3d 531, 536–37 (6th Cir.2012) (finding that attor-

ney could not advance a claim based on the rights of hypothetical future defendants to a fair trial); *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs,* 641 F.3d 197, 208–09 (6th Cir.2011) (en banc) (finding that teachers could not assert students' rights under the Establishment Clause, that the plaintiffs' injuries were not caused by the Establishment Clause violation, but that plaintiffs had municipal taxpayer standing to challenge the violation); *Alliance for Children, Inc. v. City of Detroit Public Schools,* 475 F.Supp.2d 655, 662–63 (E.D.Mich.2007) (finding that a corporation providing supplemental educational services could not assert rights of students). Here, in contrast, the plaintiffs are asserting their own Fourteenth Amendment rights to equal protection and due process, and the injuries they have identified are directly tied to the alleged violation of these rights by Public Act 297. They are asserting a violation of their own rights.

The plaintiffs have standing to bring the claims set forth in the amended complaint.

B.

■ The defendant also argues that the plaintiffs' claims are not ripe, reprising his standing argument that the plaintiffs' claims based on Public Act 297 depend on the cessation of benefits, and because no concrete injury occurs before that time, any claimed injury is speculative or uncertain. The same result obtains. *See Thomas More Law Center,* 651 F.3d at 537 (observing that "where the only Article III question concerns the imminence of the plaintiffs' injury, standing analysis parallels ripeness analysis" (citing *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,* 438 U.S. 59, 81, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978))). "Indeed if a defendant's 'ripeness arguments concern only' the 'requirement that the injury be imminent rather than conjectural or hypothetical'

then 'it follows that our analysis of [the defendant's] standing challenge applies equally and interchangeably to its ripeness challenge.'" *Id.* at 537–38 (quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,* 462 F.3d 219, 225 (2d Cir.2006)).

In this case, the plaintiffs whose benefits have not been terminated already will lose them when the publicly-employed plaintiffs' contracts expire or are renegotiated. *See Thomas More Law Center,* 651 F.3d at 538 (stating that plaintiffs had standing in part because "the plaintiffs need not do anything to become subject to the Act"). The defendant's ripeness argument, like his standing argument, fails. The claims in the amended complaint are ripe for adjudication.

### C.

The defendant believes that the Court should abstain from exercising jurisdiction over the plaintiffs' claims under the rule in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), insisting that a decision in this case would enmesh the federal court in difficult questions of state law and disrupt a coherent state policy. The Court disagrees.

Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l., Ltd.,* 556 F.3d 459, 467 (6th Cir.2009) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). As the Supreme Court taught in *Burford,* abstention may be appropriate in some cases as a matter of comity, especially in cases where equitable relief is sought. *See Ada–Cascade Watch Co., Inc. v. Cascade Resource Recovery, Inc.,* 720 F.2d 897, 903 (6th Cir.1983). And the Court later explained that the purpose of *Burford* abstention is to "protect[ ] complex state administrative processes from undue federal interference." *New Orleans Public Serv., Inc. [NOPSI] v. Council of City of New Orleans,* 491 U.S. 350, 362, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). But *Burford* abstention is appropriate only if (1) timely and adequate state court review is available and (2) the case involves difficult questions of state law or federal court resolution disrupts state efforts to establish a comprehensive policy. *Id.* at 361, 109 S.Ct. 2506. The "adequate state review" must be centralized in a forum with special competence in the particular subject matter. *Ada–Cascade Watch,* 720 F.2d at 903.

When faced with a request to abstain under *Burford,* a district court must "weigh the federal interests in retaining jurisdiction over the dispute against the state's interests in independent action to uniformly address a matter of state concern, and ... abstain when the balance tips in favor of the latter." *Webb v. B.C. Rogers Poultry, Inc.,* 174 F.3d 697, 700 (5th Cir.1999). That balance "only rarely favors abstention." *Id.* (quoting *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996)). Abstention is not required merely because a "potential for conflict with state regulatory law or policy" exists; instead, it is appropriate only where there is "undue federal interference" with "complex state administrative processes." *NOPSI,* 491 U.S. at 362, 109 S.Ct. 2506 (internal quotes omitted).

For several reasons, *Burford* abstention is manifestly improper in this case. First, acting on the plaintiffs' Fourteenth Amendment claims would in no way interfere with "complex state administrative processes." *NOPSI,* 491 U.S. at 362, 109 S.Ct. 2506. The defendant does not

even address this requirement in his brief and does not identify any state administrative agency with particular competence over the subject matter. *See Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 716 (6th Cir.2002) (finding *Burford* abstention inapplicable where there was "no state administrative agency involved in the dispute"); *see also Saginaw Housing Comm'n v. Bannum, Inc.*, 576 F.3d 620, 626–27 (6th Cir.2009).

Second, the plaintiffs have presented only federal law questions and do not raise any questions of state law, let alone any "difficult questions of state law." *NOPSI*, 491 U.S. at 361, 109 S.Ct. 2506 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Where plaintiffs raise federal constitutional claims, *Burford* abstention is discouraged. *Habich v. City of Dearborn*, 331 F.3d 524, 533 (6th Cir.2003) (stating that "the case against *Burford* is even stronger" where the question is "whether a state action violated constitutional limits").

Third, the defendant has identified no "policy problems of substantial public import whose importance transcends the result in the case at bar." *NOPSI*, 491 U.S. at 361, 109 S.Ct. 2506 (quoting *Colorado River Water Conservation Dist.*, 424 U.S. at 814, 96 S.Ct. 1236). The only policy issue that the defendant has identified is the desire to save money. But a desire to save money cannot possibly be sufficiently important to require the Court to abstain from deciding the constitutional issues raised by the plaintiffs. If it were, states could effectively insulate themselves from constitutional review by the federal courts of virtually any law by citing budgetary concerns. The defendant also argues that the plaintiffs are seeking to use a decision of this Court as a "sword ... to impose limitations on Michigan's marriage amend-

ment ... [and] to impact the broader public by requiring all public employers to provide domestic partner benefits." Def.'s Am. Mot. to Dismiss at 9. Accepting that argument requires the Court to speculate as to the plaintiffs' future litigation strategy, which serves no useful purpose here. It is enough to observe that nothing in the present complaint challenges Michigan's marriage amendment or suggests that all public employers are required to provide domestic partner benefits. Although it is true that domestic relations law generally is a matter of state concern, the plaintiffs' suit does not seek to overturn any aspect of Michigan's domestic relations law. *See Rouse*, 300 F.3d at 716 (finding that abstention was inappropriate where plaintiff brought suit to determine whether a domestic relations order created obligations under ERISA).

Fourth, federal review in this case would not be significantly "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River*, 424 U.S at 814, 96 S.Ct. 1236. It is true that a finding that invalidates Public Act 297 could result in local governments addressing domestic partner benefits inconsistently, as they did before Public Act 297 was enacted. However, *Burford* does not concern itself with that sort of disruption. *See NOPSI*, 491 U.S. at 362–63, 109 S.Ct. 2506. "[T]here is ... no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Id.* at 363, 109 S.Ct. 2506 (quoting *Zablocki v. Redhail,* 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)). The plaintiffs are requesting that this Court determine whether Public Act 297 violates the Constitution, an inquiry that does not "unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity." *Ibid.*

Abstention from adjudicating these questions is not appropriate.

## III.

The defendant argues, correctly the Court believes, that the plaintiffs have not pleaded a substantive due process violation in their amended complaint. The defendant insists that the plaintiff's due process claim fails because there is no fundamental right to public-employer-provided health insurance for domestic partners of public employees and the failure to provide such health insurance does not burden the plaintiffs' fundamental right to form and sustain intimate family relationships.

 The right to substantive due process prohibits the government from infringing on "fundamental rights" without sufficient justification. *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). "To state a cognizable substantive due process claim, the plaintiff must allege 'conduct intended to injure in some way unjustifiable by any government interest' and that is 'conscience-shocking' in nature." *Mitchell v. McNeil*, 487 F.3d 374, 377 (6th Cir.2007) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). "What seems to be required is an intentional infliction of injury ... or some other governmental action that is 'arbitrary in the constitutional sense.'" *Stemler v. City of Florence*, 126 F.3d 856, 869 (6th Cir.1997) (quoting *Lewellen v. Metro. Gov't of Nashville & Davidson County*, 34 F.3d 345, 351 (6th Cir.1994)). However, substantive due process protects only against state action that is not otherwise proscribed by the plain text of other constitutional amendments. *See Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir.2006) (reasoning that "[a]lleged conduct that does not implicate a constitutional right protected by another

amendment will be analyzed under the substantive due process component of the Fourteenth Amendment"). Where a plaintiff has recourse to an "explicit textual source of constitutional protection," *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), a more general claim of substantive due process is not available. *See Lewis*, 523 U.S. at 842, 118 S.Ct. 1708.

 It is certainly the case that there is no fundamental right to public-employer-provided health insurance for the domestic partners of public employees. As the defendant notes, there is no fundamental right to public employment; accordingly, there cannot be a fundamental right to fringe benefits granted as compensation for public employees. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). No substantive due process violation can be predicated on the denial of such benefits. The defendant also accurately states that although a property interest in a benefit may give rise to a procedural due process claim, the plaintiffs have not pleaded such a claim in their complaint. *Ibid.*

However, the plaintiffs respond that their substantive due process claim is not focused on *that* fundamental right; instead, they contend that Public Act 297 impermissibly burdens their fundamental right to intimate association.

 "The Constitution protects ... [the] freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment." *Anderson v. City of La Vergne*, 371 F.3d 879, 881 (6th Cir.2004) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). What qualifies as protected "intimate association" is very broad, and certainly covers

the plaintiffs' relationships. As the Sixth Circuit has explained, "the right to 'intimate association' is not limited to familial relationships but includes relationships characterized by 'relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.'" *Beecham v. Henderson County, Tennessee,* 422 F.3d 372, 375 (6th Cir.2005) (quoting *Roberts,* 468 U.S. at 620, 104 S.Ct. 3244). "Intimate associations" have been found in dating relationships, *Anderson,* 371 F.3d at 881–82, and personal friendships, *Akers v. McGinnis,* 352 F.3d 1030, 1039–40 (6th Cir.2003).

 The state must offer heightened justification for laws interfering with intimate associations. "A 'direct and substantial interference' with intimate associations is subject to strict scrutiny, while lesser interferences are subject to rational basis review." *Anderson,* 371 F.3d at 882 (quoting *Akers,* 352 F.3d at 1035).

 There can be no doubt that the plaintiffs' relationships, which are long-term, committed partnerships, certainly fall into the category of intimate associations protected by the Due Process Clause. *Beecham,* 422 F.3d at 376. The defendant does not contest that point, recognizing that the plaintiffs have a "fundamental right to form and sustain intimate family relationships." Def.'s Mot. to Dismiss at 17. But the defendant argues that Public Act 297 does not impermissibly burden that fundamental right. The Court agrees.

First, Public Act 297 does not present a direct and substantial interference with the plaintiffs' right to intimate family relationships because it does not prohibit the plaintiffs from forming those relationships or criminalize them. *See Lawrence v. Texas,* 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (finding that a Texas

statute criminalizing consensual sodomy violated the right to intimate association under the Due Process Clause). The plaintiffs argue that governmental action need not require the dissolution of the plaintiffs' relationship in order to burden their constitutional rights. They cite *Adkins v. Bd. of Educ. of Magoffin Cnty.,* 982 F.2d 952, 956 (6th Cir.1993), in which the Sixth Circuit held that "it is not necessary that the governmental act require the abandonment or dissolution of a marriage relationship as the price for retaining public employment. The right of association is violated if the action constitutes an undue intrusion by the state into the marriage relationship." *Ibid.* (internal quotation omitted). They also argue that once a local government has freely chosen to offer partner benefits to unmarried employees, the State cannot withhold those benefits based on the plaintiffs' exercise of their fundamental right to intimate association and family integrity. *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). However, Public Act 297 does not interfere with the plaintiffs' ability to form intimate relationships. They were in committed relationships before the public employers extended the medical benefits, and there is no reason to believe that the plaintiffs' relationships are likely to dissolve now that those benefits have been withdrawn. Put simply, although Public Act 297 may create a financial and psychological burden on the plaintiffs, it does not place a constitutionally impermissible burden on their relationships as such. *See Collins v. Brewer,* 727 F.Supp.2d 797, 808 (D.Ariz.2010).

The plaintiffs' citation to *Adkins* does not help their case. That case and the cases following it involved plaintiffs who were terminated from public employment because of their marriages. *Adkins,* 982 F.2d at 954; *Gaspers v. Ohio Dept. of*

*Youth Services,* 648 F.3d 400, 413 (6th Cir.2011); *Sowards v. Loudon Cnty., Tenn.,* 203 F.3d 426, 432 (6th Cir.2000). In those cases, the Sixth Circuit found that the plaintiffs' fundamental right to marry would be burdened if the plaintiffs' allegations were proven, because had the plaintiffs not been married, they would not have lost their jobs. *Adkins,* 982 F.2d at 956; *Gaspers,* 648 F.3d at 413–14; *Sowards,* 203 F.3d at 433. In contrast, here, the plaintiffs' committed relationships can hardly be said to have caused their loss of benefits—the plaintiffs would not have been extended other qualified adult benefits in the first place had the plaintiffs not been involved in their relationships, and were the plaintiffs no longer to be in their relationships, they would not have been permitted to retain those benefits. The plaintiffs' citation to *Perry* is also inapposite for a similar reason: in that case, a plaintiff was terminated, allegedly in retaliation for exercising his First Amendment rights. No similar retaliation is involved here. *Perry,* 408 U.S. at 597–98, 92 S.Ct. 2694.

Second, as the defendant argues, the state does not have an obligation to affirmatively assist the plaintiffs in pursuing their liberty interest in intimate association, and therefore the failure to do so does not constitute interference with that interest. *Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 358, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009) (holding that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right" (internal quotation marks omitted)). Although *Ysursa* is a First Amendment case, the principle is not limited to the First Amendment context. *See Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (citing cases involving First Amendment claims and claims involving failure to subsidize abortions); *see also Collins,* 727 F.Supp.2d at 808.

The plaintiffs argue that *Ysursa* is inapposite because it is premised in part on the fact that the state's ban on payroll deductions applied to all organizations regardless of viewpoint. However, that argument is better addressed to the plaintiffs' equal protection claim, discussed below.

The plaintiffs have failed to plead a substantive due process claim upon which relief can be granted. The Court will grant the defendant's motion to dismiss that claim.

## IV.

The plaintiffs allege in their amended complaint that Public Act 297 violates the Equal Protection Clause because it denies them employment benefits that their public employers confer on similarly-situated spouses and blood relatives. The defendant argues that the plaintiffs have failed to state an equal protection claim for three reasons. First, the defendant argues that the plaintiffs are not similarly situated to married couples. Second, the defendant argues that Public Act 297 is rationally related to the state's interest in reducing government costs and therefore that the plaintiffs' claim must be dismissed. Third, the defendant argues that the plaintiffs have failed to establish that Public Act 297 is based on discriminatory animus. Before addressing these arguments, the Court first must determine the appropriate standard of review to apply to the plaintiffs' equal protection claim.

## A.

The plaintiffs present two arguments for heightened scrutiny of Public Act 297 under the Equal Protection Clause of the Fourteenth Amendment. First, the plaintiffs argue that gays and lesbians are a suspect or quasi-suspect class that is entitled to heightened scrutiny. Second, the

plaintiffs argue that Public Act 297 discriminates on the basis of sex and therefore intermediate scrutiny applies. Based on current Sixth Circuit law, the plaintiffs swim upstream with these arguments. The cultural views of same-sex relationships—indeed, same-sex marriage—are evolving rapidly, see *United States v. Windsor,* —— U.S. ——, 133 S.Ct. 2675, 2689, 186 L.Ed.2d 808 (2013) (observing that "New York, in common with, as of this writing, 11 other States and the District of Columbia, decided that same-sex couples should have the right to marry and so live with pride in themselves and their union and in a status of equality with all other married persons"), trending toward acceptance of the plaintiffs' position. However, current Sixth Circuit law stands as an obstacle to both of the grounds the plaintiffs offer as a rationale for examining the state law against a standard other than its rational basis. *See Davis v. Prison Health Services,* 679 F.3d 433, 438 (6th Cir.2012) (stating that "this court has not recognized sexual orientation as a suspect classification" and applying rational basis review); *Scarbrough v. Morgan County Bd. of Educ.,* 470 F.3d 250, 261 (6th Cir. 2006) (stating that "homosexuality is not a suspect class in this circuit").

 Both sides accept the general proposition that the Equal Protection Clause of the Fourteenth Amendment " 'prohibits discrimination by government which either burdens a fundamental right, targets a · suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.' " *Bench Billboard Co. v. City of Cincinnati,* 675 F.3d 974, 986 (6th Cir. 2012) (quoting *TriHealth, Inc. v. Bd. of Comm'rs,* 430 F.3d 783, 788 (6th Cir. 2005)). This analysis begins with defining an "identifiable group." *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 601, 128

S.Ct. 2146, 170 L.Ed.2d 975 (2008) (stating that typical plaintiffs "generally allege that they have been arbitrarily classified as members of an 'identifiable group' " (quoting *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979))). "When the identifiable group has been recognized as a suspect or quasi-suspect class, courts examine the classification under a heightened level of scrutiny." *Davis,* 679 F.3d at 438 (citing *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 290–91, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.) (treating race as a suspect classification); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (treating gender as a quasi-suspect classification)). But "[w]hen the identifiable group has not been recognized as a suspect or quasi-suspect class, courts examine the classification under rational basis review." *Ibid.* (citing *Massachusetts Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (addressing discrimination based on age)).

### 1.

 In determining whether a class is suspect or quasi-suspect, courts examine whether the class historically has been subjected to discrimination, whether members of the group "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group," and whether the group is "a minority or politically powerless." *Lyng v. Castillo,* 477 U.S. 635, 638, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). Courts also consider whether the characteristic that defines the class "bears [any] relation to ability to perform or contribute to society." *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 441, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct.

1764, 36 L.Ed.2d 583 (1973) (plurality opinion)).

Gays and lesbians as a group would seem to satisfy each of these factors. First, gays and lesbians have suffered, and continue to suffer, widespread discrimination, not only in the private sector, but also by all levels of government. The State of Michigan has constitutionalized discrimination against gays and lesbians in its marriage amendment. Mich. Const. Art. 1 § 25. In addition, the State of Michigan provides no protection against harassment or employment discrimination on the basis of sexual orientation. *Barbour v. Dep't of Soc. Services,* 198 Mich.App. 183, 185, 497 N.W.2d 216, 217–18 (1993). The plaintiffs have presented evidence that gay men and lesbians face discrimination in Michigan, that crimes targeting gays and lesbians constituted 14% of all reported hate crimes in Michigan in 2010, and that gays and lesbians have a 27% chance of experiencing discrimination in obtaining housing in Michigan. Pls.' Mot. for Prelim. Inj. Ex. Q at 2–4, Ex. R, Ex. S at 9.

Second, gays and lesbians "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Lyng,* 477 U.S. at 638, 106 S.Ct. 2727. Homosexual persons constitute a discrete, socially visible group defined by the distinguishing characteristic of their sexual orientation. *Kerrigan v. Comm'r of Pub. Health,* 289 Conn. 135, 175, 957 A.2d 407, 432 (2008). Further, the great weight of medical and scientific authority demonstrates that sexual orientation is an immutable characteristic. *Perry v. Schwarzenegger,* 704 F.Supp.2d 921, 966 (N.D.Cal. 2010) ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation."); *Golinski v. Office of Personnel Management,* 824 F.Supp.2d 968, 986 (N.D.Cal.2012) ("[T]he consensus in the scientific community is that sexual orientation is an immutable characteristic"). Even if sexual orientation were not immutable, sexual orientation is an integral part of personal identity. *Kerrigan,* 289 Conn. at 185–86, 957 A.2d at 438.

Third, gays and lesbians constitute a minority that lacks significant political power. There can be no dispute that gays and lesbians constitute a minority of the population in the United States. The fact that gays and lesbians lack significant political power in Michigan is amply demonstrated by the fact that there are no laws prohibiting discrimination on the basis of sexual orientation and that a voter referendum recently resulted in the enactment of a constitutional amendment that bars all recognition of same-sex marriage. On a national level, gays and lesbians make up only a tiny minority of state lawmakers; thirty states have passed constitutional amendments barring same sex marriage; and federal law—until June 26, 2013—barred the recognition of same-sex marriage. *See Golinski,* 824 F.Supp.2d at 988; 1 U.S.C. § 7; Crary, David, Associated Press, *Gay Legislators Having Impact in Marriage Debates,* available at www. huffingtonpost.com/2011/03/06/gay-legislators-having-im_n_832117.html (last visited June 27, 2013) ("Of America's 7,382 state legislators, only 85 are openly gay or lesbian.").

Fourth, there can be no doubt that one's sexual orientation bears no relationship to one's ability to perform or contribute to society. Numerous courts have so found, and the defendant has not attempted to argue otherwise. *See Golinski,* 824 F.Supp.2d at 986; *Kerrigan,* 289 Conn. at 181, 957 A.2d at 435; *Varnum v. Brien,* 763 N.W.2d 862, 890–92 (Iowa 2009) (collecting cases).

The Sixth Circuit's pronouncements on the question are worthy of reexamination. The latest case, *Davis v. Prison Health Services*, relies on *Scarbrough v. Morgan County* as the authority for the idea that sexual orientation is not a recognized suspect classification. *Davis*, 679 F.3d at 438. *Scarbrough*, in turn, cited *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 292–94 (6th Cir.1997), for its holding that "homosexuality is not a suspect class in this circuit." *Scarbrough*, 470 F.3d at 261. And the *Equality Foundation* court based its holding squarely on *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). *Equality Foundation*, 128 F.3d at 292–93. *Bowers*, of course, was overruled by *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). The tarnished provenance of *Davis* and the cases upon which it relies provides ample reasons to revisit the question of whether sexual orientation is a suspect classification under equal protection jurisprudence. At present, however, that is not the law of the circuit, and it cannot govern the decision here.

### 2.

The plaintiffs also argue that intermediate scrutiny applies because Public Act 297 discriminates on the basis of the plaintiffs' sex in relation to that of their partners. The plaintiffs have not cited any case adopting that rational in the context of a federal equal protection claim. The cases that the plaintiffs cite are distinguishable. In *In re Levenson*, 560 F.3d 1145 (9th Cir.2009), the court suggested that denying benefits to a federal employee's same-sex spouse was a violation of the benefit plan's bar on sex discrimination because the benefits would not have been denied had the couple been of opposite sexes. *Id.* at 1147. That pronouncement was *dictum*, however, because the court ultimately found that because the plan also prohibited discrimination on the basis of sexual orientation, it was not necessary to determine whether the plaintiff had experienced sex or sexual orientation discrimination in order to find a violation of the benefits plan. *Ibid.* In *Baehr v. Lewin*, 74 Haw. 530, 852 P.2d 44 (1993), the Hawaii Supreme Court found that the state's civil marriage laws, which barred same-sex marriage, regulated access to marriage on the basis of sex. *Baehr*, 74 Haw. at 572, 852 P.2d at 64. That case, however, was decided on the basis of the Hawaiian constitution, which the court distinguished from the United States Constitution. *Id.* at 562, 852 P.2d at 59–60.

Further, the rationale for considering sex a quasi-suspect classification does not support extending heightened scrutiny based on sexual orientation. In finding that classifications based upon sex are inherently suspect, the Supreme Court relied on the history and pervasiveness of discrimination against women and women's relative lack of political power. *Frontiero*, 411 U.S. at 684–86, 93 S.Ct. 1764. Sex is considered a quasi-suspect classification, in large part, because "[r]ather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women." *City of Cleburne*, 473 U.S. at 441, 105 S.Ct. 3249. This stereotyping concern does not come into play when the relevant classification is based on one's sex compared to the sex of one's partner.

Sixth Circuit precedents require that the standard against which Public Act 297 must be measured in the plaintiffs' equal protection challenge is rational basis review.

## B.

■■■■■ Generally speaking, "[l]aws that do not involve suspect classifications and do not implicate fundamental rights or liberty interests ... will be upheld if they are 'rationally related to a legitimate state interest.' " *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368 (6th Cir.2002) (quoting *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir.2000)). "On rational basis review, a classification bears a strong presumption of validity and a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Alexander v. Merit Sys. Prot. Bd.*, 165 F.3d 474, 484 (6th Cir.1999) (internal quotation marks and citation omitted). In the words of the Supreme Court, the classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). The State may make classifications, provided they are "not unreasonable, arbitrary or capricious." *Molina–Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 659 (6th Cir.2008) (quoting *Gilday v. Bd. of Elections of Hamilton Cnty., Ohio* 472 F.2d 214, 217 (6th Cir.1972)). A plaintiff may also show that a government action lacks a rational basis "by demonstrating that the challenged government action was motivated by animus or ill-will." *Scarbrough*, 470 F.3d at 261 (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir.2005)). In *United States v. Windsor*, the Supreme Court held that the Defense of Marriage Act (DOMA) violated equal protection guarantees found in the Fifth Amendment. In invalidating the law, the Court held that "[t]he Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot'

justify disparate treatment of that group." *Windsor*, 133 S.Ct. at 2693 (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528, 534–35, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)). Similarly, the Sixth Circuit repeatedly has held that " 'the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, [and] a state action based on that animus alone violates the Equal Protection Clause.' " *Davis*, 679 F.3d at 438 (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873–74 (6th Cir.1997)).

The defendant offer three reasons why the plaintiffs have not pleaded a valid equal protection claim.

### 1.

■■■■■ The defendant's first argument posits that the plaintiffs have not identified a valid comparitor class because they are not similarly situated to married couples, who are eligible for benefits under Public Act 297. In support of this argument, the defendant cites *United States v. Green*, 654 F.3d 637, 651 (6th Cir.2011), but that case is inapposite. As *Green* makes clear, the "similarly-situated" requirement applies to "class-of-one" equal protection claims, in which a plaintiff does not assert that he or she is a member of a class. *Ibid.; see also Paeth v. Worth Tp.*, 705 F.Supp.2d 753, 768 (E.D.Mich.2010). However, the plaintiffs in this case are not asserting a class-of-one claim. Instead, the plaintiffs are asserting a class-based sexual orientation claim. The Sixth Circuit has held that "[a] claim alleging discrimination on the basis of sexual orientation ... should not be characterized as a class-of-one claim," but rather as a "traditional, class-based discrimination claim." *Davis*, 679 F.3d at 441–42. Because the plaintiffs' claims must be characterized as a "traditional, class-based discrimination

claim," the similarly-situated requirement simply does not apply.

Moreover, Public Act 297 creates a classification based on sexual orientation. Although the act does not use the term "sexual orientation," it both explicitly incorporates statutes that draw classifications based on sexual orientation and renders access to benefits legally impossible only for gay and lesbian couples. The Act incorporates the definitions in the Michigan marriage amendment and the intestacy statute. Both of those laws distinguish between opposite-sex couples, who are permitted to marry and can inherit under intestacy, and same-sex couples, who cannot. In *Johnson v. New York*, 49 F.3d 75 (2d Cir.1995), and *Erie Cnty. Retirees Ass'n v. Cnty. of Erie, Pa.*, 220 F.3d 193 (3d Cir.2000), the Second and Third Circuits found that employment policies facially discriminated on the basis of age, even where the policies themselves did not mention age, because they incorporated other policies with explicit age restrictions. *Johnson*, 49 F.3d at 79; *Erie*, 220 F.3d at 211. The same can be said for Public Act 297 concerning sexual orientation.

The defendant's attempt to distinguish those cases by noting that they dealt with federal anti-discrimination statutes rather than the Equal Protection Clause is unpersuasive. He has not presented any argument as to why the basic reasoning undergirding those decisions does not apply in the constitutional context. The defendant also asserts that unlike the policies at issue in those cases, the marriage amendment and intestacy statute are not facially discriminatory. That assertion cannot be reconciled with the text of the marriage amendment, which specifically defines marriage to exclude same-sex couples. That provision obviously distinguishes between opposite-sex couples, who may marry, and same-sex couples, who may not.

And although it is true, as the defendant argues, that Michigan's intestacy statutes do not prevent gay and lesbian persons from inheriting, they do prevent gay and lesbian persons from inheriting *from their partners*, as only spouses, descendants, and paternal and maternal relatives are covered by intestacy. *See* Mich. Comp. Laws §§ 700.2102, .2103.

Several courts have found that statutes restricting benefits on the basis of marriage intentionally classify on the basis of sexual orientation where gays and lesbians cannot legally marry. *Dragovich v. United States Dep't of the Treasury*, 848 F.Supp.2d 1091, 1100 (N.D.Cal.2012); *Collins v. Brewer*, 727 F.Supp.2d 797, 803 (D.Ariz.2010), *aff'd sub nom. Diaz v. Brewer*, 656 F.3d 1008 (9th Cir.2011); *Alaska Civil Liberties Union v. State*, 122 P.3d 781, 788 (Alaska 2005); *Bedford v. N.H. Cmty. Technical Coll. Sys.*, Nos. 04–E–229, 04–E–230, 2006 WL 1217283, at *6 (N.H.Super.Ct. May 3, 2006). The Arizona law invalidated in *Collins* is illustrative. Arizona does not recognize same-sex marriage, but Arizona state law permitted spouses and domestic partners of state employees to obtain health insurance benefits. In 2009, Arizona passed a law limiting state employee health insurance benefits to the employee's spouse and children. The *Collins* court reasoned that in contrast to unmarried heterosexual employees, who could marry to take advantage of state health care benefits, unmarried homosexual employees effectively were barred completely from obtaining benefits. Similarly, Public Act 297 makes health benefits available only "on terms that are a legal impossibility for gay and lesbian couples." *Collins*, 727 F.Supp.2d at 803.

The defendant responds that because under Michigan constitutional law, the benefits previously provided to the plaintiffs were not furnished on the basis of a

relationship similar to marriage, Public Act 297 cannot implicate same-sex or opposite-sex relationships. That argument misses the mark. The question is not whether the benefit schemes of the local governments that employed the plaintiff turned on the nature of the plaintiff's relationship. The question is whether, in permitting benefits to be extended only to married couples while barring same-sex couples from marrying, Public Act 297 creates a classification on the basis of sexual orientation. The details of local government benefit schemes prior to the enactment of Public Act 297 have no relevance to that question.

The defendant also argues that the plaintiffs' position would require state and local governments to provide benefits on the basis of a relationship similar to marriage in contravention of Michigan's constitution. That, too, is incorrect. Invalidation of Public Act 297 causes the statutory landscape simply to revert to its pre-Public Act 297 condition. As the defendant himself recognizes, those benefit schemes did not depend on the existence of a marriage-like relationship. Therefore, it is not only possible for local governments to provide domestic partner benefits in a manner consistent with the Michigan constitution (and for some local governments to choose not to do so), it is eminently likely that is precisely what would occur.

■ Next, the defendant argues that because domestic relations is an area of traditional state concern, the Court should not interfere. But the national government may enact and interpret laws "that bear on marital rights." *Windsor,* 133 S.Ct. at 2690 (citing *Hillman v. Maretta,* 569 U.S. ——, 133 S.Ct. 1943, 186 L.Ed.2d 43 (2013); *Ridgway v. Ridgway,* 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981); and *Wissner v. Wissner,* 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950)). Moreover, domestic relations laws are not insulated from federal constitutional scrutiny merely because they are the traditional province of the states. *See Loving v. Virginia,* 388 U.S. 1, 7, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (observing that the State of Virginia could not argue "that its powers to regulate marriage are unlimited notwithstanding the commands of the Fourteenth Amendment"). And the injunction the plaintiffs seek affects only Public Act 297, which is not a part of Michigan's domestic relations law. The defendant also suggests that federal law, including the Defense of Marriage Act, has less influence in Michigan because Michigan does not recognize same-sex marriage. That argument is ill-founded, as this case does not involve the Defense of Marriage Act or any other federal statute and there is no law supporting the suggestion that federal constitutional requirements apply with less force in states that do not recognize same-sex marriage.

■ Finally, the defendant argues that the Court should reject the plaintiffs' arguments based on the canon of constitutional avoidance. "If a statute is susceptible of 'two ... plausible constructions,' one of which 'would raise a multitude of constitutional problems, the other should prevail.'" *United States v. Erpenbeck,* 682 F.3d 472, 475 (6th Cir.2012) (quoting *Clark v. Martinez,* 543 U.S. 371, 380–81, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005)). However, the defendant has not suggested any viable interpretation of Public Act 297 that would permit the Court to avoid a constitutional decision. Moreover, to the extent that the defendant is suggesting that the Court must avoid interpreting or ruling on Public Act 297 to avoid creating a substantial conflict with Michigan's constitution, the argument is inapposite. No state constitutional issues have been presented.

The unavoidable conclusion is that Public Act 297 contains a discriminatory classification on the basis of sexual orientation.

2.

■ The State may discriminate among non-suspect classes if has a rational basis to do so. *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368 (6th Cir. 2002) (stating that "[l]aws that do not involve suspect classifications and do not implicate fundamental rights or liberty interests ... will be upheld if they are 'rationally related to a legitimate state interest'" (quoting *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir.2000))). "On rational basis review, a classification bears a strong presumption of validity and a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Alexander v. Merit Sys. Prot. Bd.*, 165 F.3d 474, 484 (6th Cir.1999) (internal quotation marks and citation omitted). The State need "only [show] that the regulation bear[s] some rational relation to a legitimate state interest." *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir.2002) (citing *Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)).

■ The defendant presents two state interests that he argues Public Act 297 advances. First, the defendant argues that Public Act 297 promotes the policy goal of furthering "traditional marriage." But the defendant himself has written off serious consideration of that argument, stating that "it strains credulity to believe that a couple would marry simply to obtain health benefits, or would acquiesce to participation in a relationship they might not otherwise choose in order to qualify for the benefit." Def.'s Am. Mot. to Dismiss at 24. Nor has the defendant presented any argument how Public Act 297 actually furthers "traditional marriage." Assuming that the state has a legitimate interest in furthering "traditional marriage," Public Act 297 is not rationally related to that policy goal.

The second argument is that Public Act 297 is rationally related to the State's legitimate interest in reducing the costs of employee benefits that municipalities must pay, and therefore no equal protection violation can be derived from the amended complaint. However, the plaintiffs have pleaded facts that plausibly demonstrate that cannot be true. The amended complaint alleges that Public Act 297 will result in only negligible cost savings to the state, which will be offset by a loss of tax revenue and increased healthcare costs, including increased use of publicly-funded health care. Am. Compl. ¶¶ 86, 90, 93, 94. Similar allegations have been found to be sufficient to survive a motion to dismiss. *Collins*, 727 F.Supp.2d at 805.

The plaintiffs also contend that the cost justification is a sham, and they have offered evidence that establishes a likelihood of success on that point. First, the plaintiffs have presented evidence that the State did not have any accurate information about the costs savings that would result from Public Act 297. Similar evidence has been found sufficient both to survive a motion to dismiss and to demonstrate a likelihood of success on the merits of a nearly identical equal protection claim. *Collins*, 727 F.Supp.2d at 811–12. In affirming that decision, the Ninth Circuit highlighted the fact that the district court was provided with an expert analysis of the law on the state's finances but did not have any evidence as to the number of same-sex domestic partners participating in the health plan or as to the costs of such participation. *Diaz*, 656 F.3d at 1013.

In this case, there were several legislative analyses that analyzed the fiscal impact of the bill, but each discussed the potential cost savings that would result

from no longer providing other eligible adult benefits to *State* employees; none analyze the fiscal impact in terms of local government employees, to which Public Act 297 is directed. Def.'s Mot. to Dismiss Ex. 1A–D. Early estimates by the Office of the State Employer placed the potential yearly cost savings (based on coverage of state employees only) at $8 million, but that figure is suspect. It later was revised downwards by the Senate Fiscal Agency to $893,000. Def.'s Mot. to Dismiss Ex. 1A, 1B.

Second, there is evidence that the type of benefits furnished by local governments will not impact the amount of funding that the state provides those governments. In Michigan, state funds are allocated to local governments on the basis of formulas set by the Michigan constitution and by statute. Mich. Const. Art. IX, sec. 30 (1963); Mich. Comp. Laws §§ 18.1115(5), 18.1349. Local governments receive funds based on a formula that depends heavily on population; school districts receive funds on a per-pupil basis. Mich. Const. Art. IX, sec. 10 (1963); Mich. Comp. Laws §§ 141.913, 141.911; Pl.'s Mot. for Prelim. Inj. Ex. M. Although local governments are generally unrestricted in the use of state funds, the state legislature has placed limitations on how much local entities can pay for employee health insurance benefits. Mich. Comp. Laws §§ 141.917, 15.561 *et seq.* Local governments must either keep their health insurance benefits payments under a hard cap set by a formula in the statute or pay 80% or less of the total costs of the medical benefits they offer; failure to do so results in a reduction in state funds. Mich. Comp. Laws §§ 15.563, .564, .569. However, local governments may exempt themselves from the Act by a two-thirds vote of their governing bodies. Mich. Comp. Laws § 15.568. In responses to interrogatories, the defendant admitted that the amount of funding Michigan provides

to local government units does not depend on whether the unit provides benefits to other insured adults or on the number of individuals to whom the units provide insurance. Pls.' Mot. for Leave to File [dkt. # 47] Ex. 3.C.

The plaintiff also has offered evidence that in 2010, the City of Kalamazoo spent approximately 15% of its budget on benefits for its employees; the estimated cost of providing insurance for one domestic partner in 2012 was $6,104.76. Pl.'s Mot. for Prelim. Inj. Ex. O at 5, 7; Pls.' Mot. for Prelim. Inj. Ex. V–1, Collard Aff. at ¶ 13. Ann Arbor Public Schools spent 9.84% of its 2009 general fund budget on employee health care benefits. Pls.' Mot. for Prelim. Inj. Ex. N. Approximately 1.2% of Ann Arbor Public Schools' health insurance costs in the 2011–2012 plan year, or $204,336, were due to coverage of other eligible adults. Pls.' Mot. for Prelim. Inj. Ex. V–2, Comsa Aff. at ¶ 11. In Ingham county, the total projected cost for providing other eligible adult benefits in 2012 is $16,157, or .002% of total expenditures on health care. Pls.' Mot. for Leave to File [dkt. # 47] Ex. 1, Lannoye Aff. at ¶ 13. Officials from the City of Kalamazoo, the Ann Arbor Public Schools, Ingham County, and Kalamazoo Valley Community College have stated that any cost savings resulting from Public Act 297 would remain with their local government unit. Pls.' Mot. for Prelim. Inj. Ex. V–1, Collard Aff. at ¶ 26, Ex. V–2, Comsa Aff. at ¶ 23, Pls.' Mot. for Leave [dkt. # 47] Ex. 1, Lannoye Aff. at ¶ 28, Ex. 2.A, Schlack Dep. at 36.

Third, the plaintiffs have offered evidence that cost savings to local governments will be *de minimus,* and that the failure to provide such benefits actually may impose additional costs on local governments. For instance, of the 194 employees of the City of Kalamazoo eligible,

six added an OQA to their plan. Pl.s' Mot. for Prelim. Inj. Ex. V–1, Collard Aff. at ¶ 6. Of approximately 1,800 full-time Ann Arbor Public Schools employees, thirty-three employees enrolled OQAs. Pl.'s Mot. for Prelim. Inj. Ex. V–2, Cosma Aff. at ¶¶ 2, 5. Of the 832 Ingham County employees eligible to participate, three had enrolled OQAs as on January 1, 2012. Pl.'s Mot. for Leave [dkt. # 47] Ex. 1, Lannoye Aff. at ¶ 7. Only one individual signed up for household member benefits at Kalamazoo Valley Community College. Pl.'s Mot. for Leave [dkt. # 47] Ex. 2.A, Schlack Dep. at 41.

The plaintiffs have presented an affidavit from an economist, Dr. M.V. Lee Badgett at the University of Massachusetts, predicting the economic and fiscal effects of Public Act 297. He states that between .3% and 1.5% of employees eligible to enroll an OQA actually did so and that the resulting increase in health care costs ranged from .3% to .7%. Pl.'s Mot. for Prelim. Inj. Ex. U, Badgett Aff. ¶ 15. He also states that the administrative costs associated with providing other qualifying adult benefits are small, one-time costs. *Id.* ¶¶ 10–12. The increases in health care costs are small and proportionate. *Id.* ¶¶ 15–16. Dr. Badgett predicts that any state savings resulting from Public Act 297 will be small, and observes that some of those benefits are paid out of local funds. *Id.* ¶¶ 17–23. He also averred that the State will lose revenue from offsetting income tax payments, not all qualified adults will be prevented from receiving benefits under the act, and eliminating insurance coverage for other qualified adults could lead to additional costs to Medicaid and other government-sponsored health programs and to an increase in uncompensated care. *Id.* ¶¶ 17–22. Finally, Dr. Badgett posits that Public Act 297 could increase employment costs to local governments by preventing them from competing

effectively with other employers for the best-qualified employees. *Id.* ¶ 24.

The defendant argues that the plaintiffs' evidence does not demonstrate a likelihood of success on the merits, because to determine that the economic benefits of the Act are too minimal to demonstrate that its classifications are rationally related to a legitimate state interest would be to engage in judicial line-drawing that oversteps highly deferential rational basis review. The Court disagrees. Aside from saying so, the defendant has offered little to support its cost-savings rationale. The weakness of the defendant's proffered explanations indicates that Public Act 297 was nothing more than an attempt to bar same-sex couples from receiving partner benefits from public employers. The defendant's justifications "come close to striking [the Court] with 'the force of a five-week-old, unrefrigerated dead fish.' " *Craigmiles,* 312 F.3d at 225 (quoting *United States v. Searan,* 259 F.3d 434, 447 (6th Cir.2001)). That evidence does not satisfy rational basis review. *Ibid.*

■ Moreover, although "a state has a valid interest in preserving the fiscal integrity of its programs" and "may legitimately attempt to limit its expenditures … a state may not. accomplish such a purpose by invidious distinctions between classes of its citizens." *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), *overruled in part on other grounds by Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). "[R]ational basis review is not a rubber stamp of all legislative action, as discrimination that can *only* be viewed as arbitrary and irrational *will* violate the Equal Protection Clause." *Hadix v. Johnson,* 230 F.3d 840, 843 (6th Cir.2000). The Supreme Court has held that although "a State has a valid interest in preserving the

fiscal integrity of its programs," the State may not attempt to "limit its expenditures ... by invidious distinctions between classes of its citizens." *Graham v. Richardson*, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (quoting *Shapiro*, 394 U.S. at 633, 89 S.Ct. 1322). Legislation curtailing benefits that is aimed at an unpopular group calls for closer examination. *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (stating that "a bare ... desire to harm a politically unpopular group" is not a legitimate state interest). And although the Sixth Circuit has not addressed the issue, the First and Ninth Circuits have held that cost savings alone are insufficient to justify an otherwise discriminatory statute. *Massachusetts v. United States Dep't of Health and Human Servs.*, 682 F.3d 1, 11, 14 (1st Cir.2012); *Diaz*, 656 F.3d at 1013–14. The plaintiffs have shown that the defendant's justifications for the discrimination wrought by Public Act 297 are so insubstantial that animus against same-sex couples remains as the only genuine justification.

### 3.

A plaintiff may also show that a government action lacks a rational basis "by demonstrating that the challenged government action was motivated by animus or ill-will." *Scarbrough*, 470 F.3d at 261. The Sixth Circuit repeatedly has held that " 'the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, [and] a state action based on that animus alone violates the Equal Protection Clause.' " *Davis*, 679 F.3d at 438 (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873–74 (6th Cir. 1997)). The defendant argues that the plaintiffs have failed to establish that Public Act 297 is based on discriminatory animus. The record suggests otherwise.

■■ The historical background and legislative history of the Act demonstrate that it was motivated by animus against gay men and lesbians. The history of debate over domestic partner benefits illustrates the tension between some local governments' desire to provide benefits to same sex couples in a manner consistent with the Michigan constitution and a desire by opponents of same-sex benefits to block them. Local governments began to offer the other-eligible-adult benefit in their present form—that is, open to partners who are of either the same or opposite sex—after the Michigan Supreme Court held that conditioning benefits on the sex of the employee's partner violated the Michigan constitution. *See National Pride at Work, Inc. v. Granholm*, 481 Mich. 56, 71–75, 748 N.W.2d 524, 535–37 (2008). It is therefore apparent that eligible adult benefits represent local governments' attempt to provide health insurance benefits to same-sex couples on a basis that is consistent with the Michigan constitution. Public Act 297 seeks to block further attempts by local governments to provide benefits to same-sex couples in a manner consistent with the Michigan constitution by setting up requirements that same-sex couples cannot meet. That history demonstrates a concerted attempt to block same-sex partners from accessing benefits that is consistent with a desire to effectuate animus against gay men and lesbians.

The plaintiffs fortify their position with statements from the sponsors of the legislation suggesting that Public Act 297 targets same-sex partners and was motivated by animus. Representative Peter Lund, a sponsor of Public Act 297, stated in reaction to the Michigan Civil Service Commission's decision to offer other eligible adult benefits that "[i]t is an absolute abomination to hear a state agency has the gall to

make such a costly and polarizing political move while people and their government are pinching pennies just to make ends meet ... this [is a] clearly political move that shifts people's hard earned dollars into the pockets of same-sex partners." Pls.' Mot. for Prelim. Inj. Ex. G–2. The lead sponsor of the act, Representative David Agema, stated that "[t]he people of this state, the Attorney General and the Michigan Supreme Court have all decided in recent years that marriage is between one man and one woman and to extend health benefits to unions that do not fall into that category is disrespectful to the people. For a state organization such as the CSC to blithely ignore these mandates is reprehensible." Pls.' Mot. for Prelim. Inj. Ex. G–1. After the Michigan legislature attempted, and failed, to overturn the commission's decision in March and April 2011, further press releases were issued by Republican lawmakers. *See* Pls.' Mot. for Prelim. Inj. Ex. G–4, Press Release by Representative Ken Yonker ("This is a strike in the face to the people of Michigan.... To disregard what the people have decided at the ballot box, and to disregard the boundaries of marriage makes a mockery of the moral fabric that has made America what it is today.... This was the worst thing to happen since we've been here and it's disgusting."); Ex. G–5, Press Release by Representative Tom Hooker ("I think Michigan residents have made it pretty clear time and again what they want with regard to benefits for unmarried and same sex partners ... For the Democrats to uphold the CSC decision today goes exactly contrary to what the people in this state have voted for, and even what our state Supreme Court has said on the issue and I'm shocked.").

Citing *Isle Royale Boaters Assoc. v. Norton*, 330 F.3d 777, 784 (6th Cir.2003), the defendant argues that statements by Michigan's legislators are not a reliable indication of their true motivation. However true that caution might be, the defendant's argument on this point is not quite correct. In *Isle Royale*, the Sixth Circuit observed that it is "wary of relying on individual legislator's statements" to divine legislative intent and declined to rely on them in that case. *Isle Royale Boaters Assoc.*, 330 F.3d at 784–85. This is not precisely the same thing as stating that statements of legislators are insufficient as a matter of law to support a finding of discriminatory animus. The former is a question of statutory construction; the second is a question of legislative purpose.

Instead, the Court takes guidance from the Supreme Court's decision invalidating DOMA, which determined legislative purpose by looking to the "history of ... enactment" and the statute's "own text." *Windsor*, 133 S.Ct. at 2693 ("The history of DOMA's enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages, a dignity conferred by the States in the exercise of their sovereign power, was more than an incidental effect of the federal statute. It was its essence."). Looking to the history and text of Public Act 297, it is hard to argue with a straight face that the primary purpose—indeed, perhaps the sole purpose—of the statute is other than to deny health benefits to the same-sex partners of public employees. But that "can never be a legitimate governmental purpose." *Davis*, 679 F.3d at 438 (quoting *Stemler*, 126 F.3d at 873–74).

The plaintiffs have stated a viable and likely successful equal protection claim. They have provided strong evidence that the discriminatory classification established by Public Act 297 is not rationally related to a legitimate governmental purpose.

## V.

■ When deciding a motion for preliminary injunction under Federal Rule of Civil Procedure 65, the Court must consider four factors: (1) the likelihood of the party's success on the merits of the claim; (2) whether the injunction will save the party from irreparable injury; (3) the probability that granting the injunction will substantially harm others; and (4) whether the public interest will be served by the injunction. *Summit County Democratic Central and Executive Committee v. Blackwell,* 388 F.3d 547, 550 (6th Cir.2004). "[T]he four factors are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny injunctive relief." *Performance Unlimited v. Questar Publishers, Inc.,* 52 F.3d 1373, 1381 (6th Cir.1995). The Court need not make specific findings regarding each of the four factors if fewer factors are dispositive of the issue. *See Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,* 119 F.3d 393, 399 (6th Cir.1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir.2000). The plaintiff has the burden of proof, and that burden is the same irrespective of whether the relief sought is mandatory or prohibitive. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.,* 163 F.3d 341, 348 (6th Cir.1998).

## A.

■ For the reasons stated above, the Court finds that the plaintiffs have demonstrated a likelihood of success on the merits of their equal protection claim.

## B.

■ The second factor also favors the plaintiffs. The plaintiffs probably will be able to prove that Public Act 297 denies them the equal protection of the laws. "[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo,* 241 F.3d 800, 809 (6th Cir.2001) (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

■ Moreover, the potential risk to the plaintiffs' health resulting from the loss of medical insurance qualifies as irreparable harm. Although a plaintiff's harm is not irreparable if it is fully compensable by money damages, *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992), the plaintiffs have presented facts suggesting that plaintiffs Ramber and Ascheri have chronic conditions that could lead to serious complications if left untreated and that these plaintiffs are unable to afford insurance coverage that would permit them to continue treatment. Plaintiff Ramber has serious problems with her left eye that require daily medication and has been diagnosed with rheumatoid arthritis and gastroesophageal reflux disease, which requires medication and may require a series of endoscopy procedures; alternative health coverage would be difficult to obtain and purchasing coverage from her employer would cost more than half of Ramber's monthly take-home pay. Pls.' Mot. for Prelim. Inj. Ex. T–5, Jach Dec. ¶¶ 9, 11; Ex. T–6, Ramber Dec. ¶¶ 7, 9; Amend. Ex. [Dkt. # 70]. Plaintiffs Ascheri and Johnson also have conditions that require regular medication or monitoring, and plaintiff Johnson has stated that she and her partner cannot afford replacement insurance. Pls.' Mot. for Prelim. Inj. Ex. T–7, Bloss Dec. ¶ 8; Ex. T–8, Ascheri Dec. ¶ 7; Ex. T–9, Miller Dec. ¶¶ 8–10; Ex. T–10, Johnson Dec. ¶¶ 7–9. The potential medical consequences and the financial uncertainty

caused by Public Act 297 are sufficient to demonstrate irreparable harm. *Schalk v. Teledyne, Inc.,* 751 F.Supp. 1261, 1268 (W.D.Mich.1990). This factor favors granting the preliminary injunction.

### C.

The balance of equities clearly favors the plaintiffs. Because "there is a likelihood that [the statute] will be found unconstitutional ..., [it is] questionable whether [the state] has any 'valid' interest in enforcing" it. *Planned Parenthood Assoc. of Cincinnati, Inc. v. City of Cincinnati,* 822 F.2d 1390, 1400 (6th Cir.1987). Meanwhile, Public Act 297 places significant financial, emotional, and medical burdens on the plaintiffs that outweigh any slight increase in cost to the State. *Schalk,* 751 F.Supp. at 1268 ("I am unconvinced that this harm [increased monthly costs] outweighs that of a retiree forced to go without medical care, or forced to choose between the basic necessities of life in order to pay his or her medical deductibles and co-pays or life insurance.").

### D.

The public interest also favors granting an injunction. The public has an interest in ensuring that only constitutional laws are enforced. *Planned Parenthood,* 822 F.2d at 1400. In addition, the public has an interest "in the preservation of a healthy population." *Schalk,* 751 F.Supp. at 1268. That interest is furthered when public employers are permitted to extend health insurance benefits and harmed when individuals are abruptly terminated from health insurance coverage. As the plaintiffs observe, the public interest is also served by giving local authorities the autonomy to structure their benefit plans to attract and retain the most qualified possible workforce.

### VI.

There remains a question as to the scope of the remedy at this stage of the proceedings. The defendant has raised two concerns over breadth of an injunction, the first of which need not detain the Court. The defendant appears to be concerned that the Court might issue an injunction ordering local governments to provide benefits to other eligible adults. But the Court does not read either the plaintiffs' amended complaint or their motion for a preliminary injunction to request such relief. Instead, the plaintiffs seek a declaration that the Act violates the Fourteenth Amendment and preliminary and permanent injunctions enjoining the defendant from enforcing the Act. The defendant appears to be laboring under a misapprehension as to the relief requested by the plaintiffs; the plaintiffs do not seek to require local governments to provide benefits, instead, they seek to enjoin the state from prohibiting public employers from offering benefits. The significant difference between these two propositions seems to have escaped the defendant, which in turn renders the defendant's argument slightly confused. Indeed, the parties appear to agree on the main point: if the Court finds that the statute is facially unconstitutional, the Court may issue a judgment so stating and enter a permanent injunction barring the defendant from enforcing the statute.

The second question is whether preliminary injunctive relief should be confined to the plaintiffs in this case. The defendant argues that a preliminary injunction should benefit only the named plaintiffs because enjoining enforcement of the statute itself would effectively grant the relief sought in the complaint and would involve enjoining third parties.

The defendant relies mainly on *Sharpe v. Cureton,* 319 F.3d 259 (6th Cir.2003). In that case, the named plaintiffs were

firefighters who proved at trial that the mayor of Knoxville unlawfully discriminated against them for supporting an opponent in a political election. The trial court permanently enjoined the mayor not only from discriminating against the plaintiffs, but also against any city employee. The court of appeals held that the scope of the injunction was too broad and "unnecessary to provide the named plaintiffs the relief to which they [were] entitled as prevailing parties." *Id.* at 273. The court explained that "[w]hile district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an *individual suit*, such broad relief is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Ibid.* (emphasis in original); *see also Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) (citing *Sharpe* for this principle).

■ *Washington v. Reno*, 35 F.3d 1093 (6th Cir.1994), suggests that the test for determining whether to apply class-wide relief in a case involving individual plaintiffs is the same regardless of whether the injunction is preliminary or permanent. That case involved the federal Bureau of Prisons' use of the proceeds of the Commissary Fund, a trust of which federal inmates are the sole beneficiaries, to install and operate a direct dial system in place of a collect call system. The plaintiffs were individual federal prison inmates. The district court issued a preliminary injunction enjoining, among other things, the use of proceeds from the Commissary Fund to pay for the implementation of a direct dial system. The injunction was nationwide in scope rather than limited to the individual plaintiffs. The Sixth Circuit acknowledged that " 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the

plaintiffs.' " *Id.* at 1103 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). Nevertheless, the court upheld a nationwide injunction because it found that "the appropriate relief to be granted to the plaintiffs on their Commissary Fund claim necessarily implicate[d] nationwide relief." *Id.* at 1104. The court reasoned that "[t]he named plaintiffs' gains in obtaining an injunction prohibiting further invasions of the trust for the primary purpose of installing security equipment would be illusory indeed if the defendants were banned from funding security measures through the Commissary Fund at the Lexington facility only, but could finance those same measures at other institutions through invasions of Fund accounts." *Ibid.*

■ The Court believes that it is necessary to enjoin the wholesale enforcement of the Act in order to provide complete relief to the plaintiffs. The nature of the relief sought does not impact any conduct by the defendant directed specifically toward the plaintiffs. Rather, the plaintiffs seek to prevent the defendant from interfering with their *employers'* voluntary action. Public Act 297 itself bars public employers from paying partner benefits; it is not enforced against the individual plaintiffs. An injunction, therefore, will necessarily bar the defendant from enforcing the Act against public employers, rather than against the individual plaintiffs. These circumstances parallel those in *Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987), where the district court imposed an injunction directing the Secretary of Labor to integrate forestry workers into its enforcement of the Migrant and Seasonal Agricultural Workers Protection Act. That Act required registration of labor contractors with the Department of Labor and disclosure of employment conditions to workers; it also imposed health and safety

standards. *Bresgal,* 843 F.2d at 1165, 1169. The Secretary appealed, arguing that the injunction was overbroad, would affect more than the named plaintiffs, and would "require the national adoption of the court's interpretation of the Act." *Id.* at 1169. The court observed that "[c]lass-wide relief may be appropriate even in an individual action." *Id.* at 1171 (citations omitted). It was appropriate in that case, the court held, because "it is labor contractors," not the individual plaintiffs, "who are most directly affected by the injunction against the Secretary." *Ibid.* Because the plaintiffs' harm was the result of the statute's effect on third-party conduct, it was impractical to attempt to isolate only those contractors who dealt with the plaintiffs and limit the injunction's application. The court held that the district court properly ordered what turned out to be nationwide relief. *Ibid.*

The plaintiffs here are similarly situated to the plaintiffs in *Bresgal.* To provide effective relief, the injunction must prohibit the defendant from enforcing Public Act 297, which applies to public employers. An injunction applicable only to the named plaintiffs would be impractical and difficult to enforce. The injunction will not mandate any public *employer* to do anything; it simply returns the employer-employee relationship to its status before Public Act 297 was enacted.

## VII.

The Court concludes that the plaintiffs have standing to bring their challenge to the state statute, their claims are ripe, and abstention is not appropriate. The Court also finds that the plaintiffs have not stated a claim for which relief can be granted based on the deprivation of their right to substantive due process. However, they have stated a viable claim based on the Equal Protection Clause on which they are likely to succeed. Other factors favor issuance of a preliminary injunction.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss and amended motion to dismiss [dkt. # 15, 18] are **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the Second Claim for Relief in the amended complaint is **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that the plaintiffs' motion for preliminary injunction [dkt. # 18] is **GRANTED.**

It is further **ORDERED** that the defendant, his officers, agents, servants, employees, and attorneys, and all those in active concert and participation with him who receive actual notice of this order are **RESTRAINED AND ENJOINED** from enforcing Michigan Public Act 297 (2011) during the pendency of this action or until further order of the Court. The Court finds that no security is required because no costs or damages that could result from the defendant being wrongfully enjoined have been shown.